[L. A. No. 19660.   In Bank.   Jan. 16, 1948.]

UNION OIL COMPANY OF CALIFORNIA, Appellant, v. UNION SUGAR COMPANY (a Corporation), Respondent.

L. A. Gibbons, Jerry H. Powell, Douglas C. Gregg, Brobeck, Phleger & Harrison, Maurice E. Harrison and Moses Lasky for Appellant.

Cross & Brandt and Arthur H. Brandt for Respondent.

TRAYNOR, J.—Plaintiff brought this action for declaratory relief to obtain a determination of its drilling obligations under an oil and gas lease as modified by a supplemental agreement between the parties. Plaintiff appeals from a judgment entered in favor of defendant, Union Sugar Company.

The original lease was executed in 1936 between defendant, Union Sugar Company, as lessor, and Sovereign Oil Corporation, as lessee. E. H. Moore, Incorporated, a one-man corporation, hereinafter referred to as Moore, succeeded to the rights of the lessee. Subsequently, plaintiff acquired the lease from Moore. The original lease gave the lessee the right to extract oil and gas from a tract of land containing approximately 6,700 acres for 20 years and for as long thereafter as hydrocarbon substances were produced from the land. The lessee agreed to pay the lessor a royalty of one-eighth of the proceeds from the sale of the oil and gas. Paragraph 7 of the lease provided that after the discovery of oil and gas in paying quantities, the lessee would continue to drill additional wells until it had drilled one well for each 10 acres held under the lease. It also specified the rate of drilling required of the lessee:

"After the discovery of oil or gas in paying quantities on the demised premises, Lessee agrees to continuously operate one string of tools with due diligence for the first year after such discovery, two strings of tools for the second year after such discovery, three strings of tools for the third year after such discovery, four strings of tools for the fourth year after such discovery, and five strings of tools thereafter until the drilling requirements herein specified are complied with. Lessee may defer the commencement of the next well to be commenced with each string of tools to be operated hereunder for a period of not to exceed three months after the completion of the well next preceding the well drilled with that particular string of tools. The lessee shall be entitled to drill as many additional wells on said land and premises as it desires."

The original lease contains three clauses suspending the drilling requirements of paragraph 7. Paragraph 7, in addition to its other provisions, provides:

"Drilling and producing operations hereunder may also be suspended while the value of oil of the quality produced from said land, as defined in paragraph One hereof is Sixty Cents or less per barrel at the well, or when there is no available market for the same at the well at such price."

Paragraph 10 of the lease contains a *force majeure* clause providing that the drilling requirements shall be suspended whenever the lessee is prevented from complying with the lease because of strikes, lockouts, actions of the elements, accidents, rules and regulations of any federal, state, municipal or other governmental agency, or because of other matters or conditions beyond the lessee's control.

Paragraph 33 provides that the lessee may suspend drilling operations if it is obligated to curtail production by reason of any valid order, rule, law or regulation of any federal, state or other governmental subdivision and such curtailment makes it impossible for the lessee to produce oil at a profit.

Two other provisions of the original lease are pertinent. Paragraph 9 of the original lease provides that the lessee agrees to drill offset wells whenever a well on adjoining property within 250 feet of the limits of the land contained within the lease is producing oil or gas in paying quantities. Paragraph 25 of the original lease provides that the lessee may surrender all or any part of the acreage and thus reduce the number of wells to drill.

Soon after the lease was executed, the Pacific Coast Railway Company, which owned a strip of land extending across part of the leased premises, became a party to the lease. This company was named as a defendant in the present action, but permitted its default to be entered and is not a party to this appeal.

In September, 1939, the price of oil produced at the wells on the leased premises dropped below 60 cents a barrel, and Moore, who was then the lessee, suspended drilling operations in accord with the provisions of paragraph 7. By this time, the lessee had spent over a million dollars in drilling 12 wells, two of which were dry, three wholly unprofitable, and the rest of moderate production. In October, the price of oil of the quality produced by these wells was from 45 to 46 cents a barrel at the wells. In that month Moore and the Union Sugar Company commenced negotiations for a modification of the lease. In 1940, the defendant Union Sugar Company entered into a formal agreement with Moore. The agreement was entitled "Supplemental Contract" and was executed as of February 1, 1940, by defendant, Pacific Coast Railway Corporation, and Moore. By the terms of this agreement the parties agreed that the original lease "be and the same is hereby, modified in the following respects, to wit:

"(1) All obligations to drill additional wells, except off-set wells, are hereby suspended for a period of two years from February 1, 1940.

"(2) At the expiration of said two year period, Moore shall be obligated to complete three wells per year.

"(3) Numerical paragraph (9) of the lease of April 8, 1936, [with respect to off-set wells] shall be modified by striking out '250 feet' wherever the same appears therein, and inserting in lieu thereof '330 feet.'

"(4) Commencing from the date of this supplemental contract, Moore agrees to pay a minimum royalty of $25,000.00 per year, payable monthly in advance, and said royalty shall be charged against the total oil reserves during the course of the life of the lease; that is to say, Moore shall be entitled to all oil and/or gas produced from said lease, or the proceeds thereof, until it is fully reimbursed from lessors' one-eighth royalty interest for the minimum royalty so paid.

"(5) Except insofar as the provisions of the lease of April 8, 1936, are in conflict herewith, the same shall remain in full force and effect."

In 1940, plaintiff acquired the rights of Moore as lessee. On June 22, 1942, defendant served on plaintiff a notice of default reciting that plaintiff was not operating two strings of tools on the leased property and was therefore not complying with the terms and conditions of paragraph 7 of the original lease, since the price of oil was then over 60 cents a barrel. The notice also recited that if this failure continued for 90 days after the date of the notice, the lease would terminate and the lessee's rights to drill additional wells would be forfeited. A controversy having arisen concerning the extent to which the supplemental contract modified the drilling obligations of paragraph 7 of the original lease, this action was brought. Plaintiff alleged that clause 2 of the "Supplemental Contract" modified paragraph 7 so that the lessee after February 1, 1942 is only obligated to drill three wells a year regardless of the price of oil.

When the case first came on for trial the court sustained defendant's objection to the introduction of any extrinsic evidence with reference to the negotiations and circumstances surrounding the execution of the supplemental agreement. The complaint was amended, and when the case came on for trial the second time defendant's objection to the introduction of this evidence was overruled and the evidence was admitted. The trial court, however, found that the drilling obligations of

paragraph 7 were not modified by the "Supplemental Contract so as to obligate plaintiff only to complete three wells each year in lieu of the continuous operation of any specified number of strings of tools." Accordingly, the trial court concluded that the plaintiff, after February 1, 1942, and during the remainder of the terms of said lease, is bound by the drilling requirements of paragraph 7 of the original lease, and construed the modification clause as binding the plaintiff, "after February 1, 1942 . . . to complete in *any event* at least three wells each year on the premises described in said lease." (Italics added.)

This requirement, however, was held subject to the provisions of paragraph 10 of the original lease and "plaintiff is not required to perform the same if and while plaintiff is prevented from complying therewith in whole or in part by reasons of strikes, lockouts, action of the elements, accidents, rules and regulations of any Federal, State, Municipal or other governmental agency or other matters or conditions beyond the control of the plaintiff."

From a judgment for defendant entered in accord with this conclusion, the plaintiff appeals, on the ground that the trial court erroneously construed the "Supplemental Contract" as not modifying the drilling requirements of paragraph 7 of the original lease. ■ The first question presented by this appeal is whether the trial court acted properly in admitting evidence of negotiations between the parties as an aid to the interpretation of the supplemental contract. Both parties contend that apart from these negotiations the contract is susceptible of only one interpretation. They disagree, however, as to what that interpretation should be. Defendant contends that the trial court's interpretation must be sustained because the supplemental contract on its face provides that "All obligations to drill additional wells . . . are hereby suspended for a period of two years from February 1, 1940. . . . At the expiration of said two year period, Moore shall be obligated to complete [in any event at least] three wells per year." Plaintiff contends that the provision in question is clear on its face and reasonably susceptible of only one construction, namely "At the expiration of said two year period, Moore shall be obligated to complete [only] three wells per year." The basis of plaintiff's contention is that since the provision contains the word "obligated," it was intended to measure the obligation of the lessee and thus replaces the drilling requirements of paragraph 7 of the original lease. An examination of both the lease

and the "Supplemental Contract" makes it clear that they cannot be construed together without reading words into clause 2 of the latter instrument.

Once something has to be read into a contract to make it clear, it can hardly be said to be susceptible of only one interpretation. It would have been error for the trial court to read something into the contract by straining "to find a clear meaning in an ambiguous document, and having done so exclude the extrinsic evidence on the ground that as so construed no ambiguity exists." (*Body-Steffner Co.* v. *Flotill Products,* 63 Cal.App.2d 555, 562 [147 P.2d 84].) Moreover, the construction advanced by the defendant would not support the decision of the trial court. Merely reading the words "in any event" into the clause in question was not sufficient to clarify the meaning of the lease as modified, for the trial court held that plaintiff was not obligated to drill wells in any event. Paragraph 7 was not the only provision of the original lease providing for a suspension of drilling requirements. The trial court held that plaintiff's obligation to drill was subject to suspension in the event of strikes, accidents and other conditions specified in the provisions of paragraph 10 of the original lease but such obligation to drill would not be suspended by reason of the conditions specified in paragraph 33. This construction, if based only on the express wording of clause 2 of the "Supplemental Contract," would be unreasonable, for it would require the court to read the clause as if it provided that "Moore shall be obligated to drill three wells per year [under all circumstances except those provided in paragraph 10 of the original lease but not including the provisions of paragraphs 7 and 33 thereof]."

It is thus apparent that the contract is not clear on its face, and under the theory of the parol evidence rule that has been accepted by the majority of this court,[1] evidence of the negotiations of the parties and of surrounding circumstances was admissible for the purpose of determining the meaning of the

---

[1]The view has been expressed that the requirement of ambiguity involved in the admission of extrinsic evidence "simply means that the language used by the parties must be susceptible to the meaning claimed to have been intended by the parties." (Dissenting opinion in *Estate of Rule,* 25 Cal.2d 1, 22 [152 P.2d 1003, 155 A.L.R. 1319].) Under this theory, extrinsic evidence is generally admissible to show the sense in which the parties used language embodied in the contract, whether or not the words appear ambiguous to the reader. (See concurring opinion in *Universal Sales Corp.* v. *California etc. Mfg. Co.,* 20 Cal.2d 751, 776 [128 P.2d 665]; Rest. Contracts, § 242, comment a; Holmes, *The Theory of Legal Interpretation,* 12 Harv.L.Rev. 417, 420; *Wigmore on Evidence,*

lease as modified by clause 2 of the "Supplemental Contract." (Code Civ. Proc., §§ 1856, 1860; *Universal Sales Corp.* v. *California etc. Mfg. Co.*, 20 Cal.2d 751, 761 [128 P.2d 665]; *Wachs* v. *Wachs*, 11 Cal.2d 322, 326 [79 P.2d 1085]; *Balfour* v. *Fresno Canal & Irrigation Co.*, 109 Cal. 221, 223 [41 P. 876]; *Weinstein* v. *Moers*, 207 Cal. 534, 540 [279 P. 444]; *McNeny* v. *Touchstone*, 7 Cal.2d 429, 433 [60 P.2d 986]; *Body-Steffner Co.* v. *Flotill Products, supra,* 63 Cal.App.2d 555, 561; McBaine, California Evidence Manual, §§ 408, 409.)

This conclusion does not run counter to the provision of the "Supplemental Contract" that "Except insofar as the provisions of the lease of April 8, 1936, are in conflict herewith, the same shall remain in full force and effect." It is clear that before this general provision can be applied, the meaning of the specific provisions of the agreement must first be ascertained in order to determine the extent to which they conflict with the original lease.

The question remains whether the trial court's conclusion as to the meaning of clause 2 of the supplemental contract can be affirmed on the basis of the extrinsic evidence. This evidence consisted of various letters between the representatives of the parties to the modification agreement and testimony with reference to a conference, during the course of negotiations, between Moore's representative and the president and two directors of defendant corporation. The evidence with reference to the letters is not in conflict. The trial court made specific findings as to what occurred at the conference and found that the letters were properly mailed and received.

In October, 1939, Mr. Villard Martin, Moore's attorney, entered into negotiations with Mr. T. A. Twitchell, attorney for defendant, for the purpose of modifying the original lease. The evidence regarding these negotiations and the tentative plan agreed upon by the two representatives is contained in a letter written on October 14, 1939, by Mr. Twitchell addressed to Mr. Edmunds Lyman, then president of defendant corporation, for the purpose of having Mr. Lyman submit the proposed plan to defendant's board of directors. The letter stated that "Mr. Moore desires to construct a topping plant to handle the oil from the lease, but does not desire to spend the money required to build this plant if he has to comply with the exist-

(3d ed.) §§ 2458-2478; McBaine, *The Rule Against Disturbing Plain Meaning of Writings,* 31 Cal.L.Rev. 145.) In view of the fact that the instrument involved in this case is not free from ambiguity, it is unnecessary to consider the applicability of this interpretation of the extrinsic evidence rule. (See *Body-Steffner Co.* v. *Flotill Products, supra* at 562.)

ing drilling requirements of the lease.'' The plan tentatively agreed upon by the two attorneys is outlined in the letter as follows:

''1. The Union Sugar Company shall agree to suspend all drilling obligations for a period of two years, except the obligation to drill offset wells. At first glance, this may appear to be too much of a concession, but on the other hand, at the present price of oil, Moore is not obligated to drill. Based upon my conversations with operators in the field, I do not believe that the price of this grade of oil is going above 60¢ per barrel within the next two years. Of course, no one can foresee the future market conditions, and if oil should go to 60¢ or more per barrel, the Company would lose the royalty on the allowable production from the wells which Moore would be required to drill if the lease was not modified. To offset this, the Company would begin to receive royalty from the lease immediately if the lease is modified and Moore constructs a topping plant.

''2. The existing proven area, comprising some 400 acres, would be zoned and in that zone, after two years, Moore would be required to drill 3 wells per year, provided that the price of oil is 60¢ or more per barrel at the well, excepting when the following circumstances existed: . . . [at this point the letter contains further limitations on the requirement of drilling three wells a year which are not material to the case since they are not covered in the contract.]

''The provision calling for three wells per year was inserted because three wells per year would be all that Moore would be required to drill, assuming that he was operating with one string of tools. Martin said he might desire to drill three wells all at one time under contract rather than to allow 90 days to elapse between wells, as provided in the lease.

''3. Moore should not be obligated to drill any additional wells on any part of the leased property outside of the proven area, unless oil should be discovered in the property or adjacent property at such locations that it would appear probable that oil could be discovered and produced from a portion of the unproven area.''

This plan was rejected by defendant's board of directors. The negotiations leading to it are important, however, for they indicate that at that time Moore was interested in building a refinery; that he wished to be relieved of drilling obligations for two years; and that thereafter he was to drill only three wells per year when the price of oil was over 60 cents.

The letter is also relevant to show the connection between the requirement of paragraph 7 of the original lease that the lessee operate a certain number of strings of tools and the requirement of clause 2 that the lessee drill three wells since one string of tools will ordinarily drill one well a month. In view of the 90-day interval between the completion of one well and the beginning of another provided for in the original lease, one string of tools would apparently drill about three wells each year.

After entering into the foregoing negotiations with Mr. Twitchell, Moore's attorney returned to Tulsa, Oklahoma. The trial court found that, "in December 1939 [Mr. Martin] again went to California; that upon his return to California he had a conference with Roland E. Tognazzini, Francis L. Cross and Fred Cooke respecting a possible modification of said Original Lease; that said Roland E. Tognazzini was then President and said Francis L. Cross and said Fred Cooke were then directors of the defendant UNION SUGAR COMPANY; That during said conference said Villard Martin stated to said Roland E. Tognazzini that said E. H. MOORE, INC. considered the drilling requirements of said lease of April 8, 1936, as prohibitive and desired some relief therefrom and that said E. H. MOORE, INC. desired to have said drilling requirements modified so as to provide for a complete suspension of drilling operations for two years.

"That it is true that said Roland E. Tognazzini stated to Villard Martin that defendant UNION SUGAR COMPANY 'had a situation where the Company because of a posted price of oil being less than 60¢ which was the figure in this particular lease stood not to receive revenue for a great many years to come' and that if said E. H. MOORE, INC. desired relief upon the drilling requirements of said Lease it would be necessary for them to pay an adequate consideration for it.

"That it is true that said Villard Martin returned to Tulsa, Oklahoma, and on January 11, 1940 wrote and sent to said Roland E. Tognazzini and said Roland E. Tognazzini in due course received the letter dated January 11, 1940. . . ." This letter repeated substantially the plan that had been submitted to defendant in Twitchell's letter of October 14, 1939.[2] By

[2]With respect to the modification of drilling requirements of the lease Mr. Martin's letter of January 11, 1940, contained the following proposal:

"All obligation to drill additional wells, except offset wells, are hereby suspended for a period of two years from the date of this contract.

"At the expiration of said two year period, Moore shall be obligated to

a letter dated January 16, 1940, and addressed to Martin, defendant's president, Tognazzini, again rejected this proposal and made a counteroffer. This letter reads as follows:

"In response to yours of the 11th, may I first advise that the terms and conditions contained therein are unsatisfactory.

"It was my impression from past conversations you had with my predecessor, and more recently, with Messrs. Cooke, Cross, and me that it was the desire of E. H. Moore, Inc. to obtain a modification of the present oil and gas lease existing between E. H. Moore, Inc., and the Union Sugar Company. In this connection, I expressed to you at our recent meeting that Union Sugar Company was desirous of cooperating with E. H. Moore, Inc., but only to the extent that both parties were to benefit mutually by said modification.

"I gathered definitely that the main desire for a modification on your part was *to eliminate what you consider an onerous drilling clause. In this connection I stated that we would be willing to modify said drilling clause after due and proper consideration were given therefor.*

"*As I see the problem, it resolves itself down to a very simple one, to-wit: your desire to be released of the present drilling clause and be permitted to drill after a two year suspension of all drilling requirements, three wells per year. We on the other hand, desire to obtain a minimum royalty throughout the duration of the lease.* In view of the fact that the present lease ties up some 6,700 acres and further, in view of the fact that E. H. Moore, Inc., has arbitrarily determined that 400 acres are proven, in spite of the fact that it is the consensus of opinion that considerably more acreage is oil bearing, it necessarily follows that to determine a minimum royalty based upon the unit plan as you have indicated in yours of the 11th, cannot logically follow.

---

drill three wells per year in any area consisting of approximately 400 acres, being that part of the leased premises which is considered proven territory and identified by a plat attached hereto as Exhibit A, provided that the price of oil is sixty cents per barrel, or more, at the well, except that Moore shall not be obligated to drill during the existence of either of the following conditions:

"(a) If Moore is unable to market oil to be produced from said property;

"(b) If operators in the field are unable to market 100 barrels, or more, per day from wells capable of producing 1500 barrels, or more, per day, and Moore would be unable to market 100 barrels, or more, per day from any well to be drilled by it on said property;

"(c) If Moore is unable to market any oil in addition to the quantity of oil produced from wells already drilled by Moore while said wells are being operated in compliance with good oil field practice."

"Both you and I, in obtaining a modification, desire to reduce it to its simplest form and to this extent I suggest the following, to-wit:

"(1) *the suspension of all obligation to drill additional wells, except offset wells, for a period of two years from date of the modification,*

"(2) the modifying of the paragraph 9, by striking out 250 feet and inserting in lieu thereof 330 feet, and in addition thereto, appropriate language to provide that when offset wells are being produced within said range, more or less, E. H. Moore, Inc. likewise produce,

"(3) *at the expiration of the two year period, E. H. Moore, Inc. shall be obligated to drill three wells per year.*

"The consideration for the above will be the paying of a minimum royalty of $25,000 per year, said royalty payable monthly in advance." (Italics added.)

It is notable that the wording of clause (1) of this proposal is almost identical with paragraph (1) of the modification agreement and that there is no substantial difference between the wording of clause 3 of the proposal and paragraph (2) of the agreement. (See *McNeny* v. *Touchstone,* 7 Cal.2d 429, 435 [60 P.2d 986].)

The proposal contained in the foregoing letter was eventually accepted by Moore but not without further negotiations. Moore replied to Tognazzini's letter on January 25, 1940, stating that clauses (1) and (2) were acceptable but that "there should be some conditions attached [to clause (3)] that would provide for an exemption from drilling obligations under certain possible market conditions and the price of oil." Moore also stated that the consideration asked by Tognazzini was not satisfactory, and Moore offered to pay $1,000 a month minimum advance royalty beginning February 1, 1940.

In a letter dated January 27, 1940, Tognazzini rejected this counteroffer and again offered the terms contained in his letter of January 16, 1940. He stated in his January 27th letter:

"It has been the policy of this company to cooperate to the fullest with its lessees, whomsoever, and it shall continue that policy in the future. In this particular case you have asked for concessions which in the final analysis operate exclusively unilaterally in your behalf.

"Because of your past financial performance on our property and the anticipated future performances in the same

connection, we have been willing to entertain such a unilateral arrangement solely because of our desire to be cooperative. *In entertaining such a modification, we have asked only for a nominal sum of $25,000 per year, payable monthly in advance.* Said consideration is really not a consideration, but merely a payment, monthly in advance, of a minimum royalty from presently known oil reserves; said royalty to be charged against the total oil reserves during the course of the life of the lease. So in effect any modification of this lease operates strictly to your added and new benefit and *without any added benefit to us.*

"You infer that the modification might commence as of February 1st. In this connection may I advise that the monthly meeting of the Board of Directors is to be held Wednesday, January 31st at 1:30 p. m. If you desire that I obtain from the Board at such meeting a ratification of the proposed modification, as contained in mine of January 16th, please notify me on or before said date. *If that be your desire, it will be a simple matter to draw up a modification as heretofore outlined, the language pertaining thereto to be satisfactory to both parties.*" (Italics added.)

This offer was accepted by Moore in a letter dated January 29, 1940. Moore wrote:

"Replying to your favor of the 27th inst., I beg to advise that I have decided to accept your proposition and pay you an advance royalty equalling $25,000.00 per year, payable monthly in advance, beginning with the month of February. I am therefore enclosing herewith check for $2,083.33 being the first monthly payment on the proposed modification that you will submit to your Board of Directors on the 31st."

The letter continued with reference to matters not pertinent to this case. Moore concluded the letter as follows:

"I will request Mr. Martin to prepare a modification of the lease embodying the principles contained in our correspondence, and forward it to you within the next day or two. I would do it at this writing, but Mr. Martin is occupied now in the trial of a lawsuit that may cause a little delay, but if your Board authorized the modification, I think that is all that will be required."

Mr. Tognazzini acknowledged the check and reported that the proposal had been accepted by the board of directors of respondent in a letter dated February 1st, 1940, with the following language:

"In reply to yours of January 29th, I am pleased to advise that at the meeting of the Board of Directors yesterday afternoon the proposed modification of Oil Lease by and between Union Sugar Company and E. H. Moore, Inc., as contained in my letter to you of the 16th and accepted by you in yours of January 29th, was ratified.

"I am sure that Mr. Martin and I will be able to embody the principles agreed upon, to the satisfaction of all parties, and I shall do nothing further in this connection until I hear from Mr. Martin."

The trial court found that "thereafter and as of the date of February 1, 1940, defendant UNION SUGAR COMPANY and the said E. H. MOORE, INC., entered into a written agreement entitled 'Supplemental Contract'. . . ." The Pacific Coast Railway Corporation signed the "Supplemental Contract," thus making it a binding modification of the original lease.

Considering the correspondence quoted above and the specific findings of the trial court with reference to the negotiations, the conclusion is inescapable that, except for the provision in regard to offset wells, the parties intended to relieve the lessee of the obligation to drill more than three wells a year after the expiration of the two-year period of suspension of drilling. These letters and findings show that the lessee wanted a two-year suspension of all drilling because he was contemplating the building of a refinery and that the defendant was willing to agree to this suspension because there was little likelihood that the lessee would be obligated under the lease to drill during that period in any event. The lessee also desired a modification of the drilling requirements of clause 7, subject to limitations, based on market conditions and the price of oil. On the other hand, the lessor wanted an assurance of annual income from the lease and insisted that Moore, after the end of the two-year suspension, be required to drill three wells a year regardless of market conditions and the price of oil. The parties finally agreed to terms suggested by defendant's president, which were proposed as a concession to the lessee without any substantial benefit to the lessor except for the advance royalties. Given the explanation of these terms by defendant's president, it is clear that the parties agreed that the lessee would be obligated to drill three wells a year regardless of the price of oil or other market conditions, and that this obligation was in lieu of the drilling requirements of para-

graph 7 of the original lease. In consideration for this concession, the lessee agreed to pay advance royalties and to increase his drilling obligations in regard to offset wells.

The trial court nevertheless concluded not only that the parties did not intend to grant any concession to the lessee other than the two-year suspension, which the lessor's president had virtually admitted to be an unnecessary provision, but that the lessee had agreed to assume drilling obligations in addition to those under paragraph 7 of the original lease, to pay advance royalties, and to increase his obligations with respect to offset wells.

It is contended that the trial court erroneously interpreted the contract without regard to the extrinsic evidence. The trial court found "That it is untrue that the claims of defendant UNION SUGAR COMPANY have created an ambiguity or that any ambiguity is apparent upon the face of said Original Lease as modified by said Supplemental Contract." If this "finding" was intended as a finding that extrinsic evidence was inadmissible, it is of course an erroneous conclusion of law. (*Brant* v. *California Dairies, Inc.,* 4 Cal.2d 128, 133 [48 P.2d 13]; *Wachs* v. *Wachs,* 11 Cal.2d 322, 325 [79 P.2d 1085].) The trial court, however, admitted evidence with reference to the negotiations between the parties and made extensive findings thereon. It must therefore be assumed that the finding merely means that the trial court concluded that the contract, considered with reference to the evidence of these negotiations, was none the less susceptible of only one interpretation, namely the interpretation relied on by defendant. (*Eastman Oil etc. Corp.* v. *Lane-Wells Co.,* 21 Cal.2d 872, 875 [136 P.2d 564].) The question remains, therefore, whether there was any evidence from which a reasonable inference could be drawn to support this conclusion. (*Eastman Oil Corp.* v. *Lane-Wells Co., supra; Estate of Platt,* 21 Cal.2d 343, 352 [131 P.2d 825]; *Estate of Rule,* 25 Cal. 2d 1, 10 [152 P.2d 1003, 155 A.L.R. 1319].)

Defendant contends that the evidence with reference to the conference in San Francisco between Martin, as Moore's representative, and three directors of defendant corporation is in conflict and that a reasonable inference can be drawn from the evidence in defendant's favor, supporting the conclusion that the contract means that the drilling requirements of paragraph 7 of the original lease were not modified by the supplemental agreement.

Tognazzini testified that when Martin came to California after the submission of the plan outlined in the Twitchell letter of October 14th, 1939, the witness informed him that the proposal had been rejected by defendant's board of directors. The witness also testified that he stated at the conference that because of the price of oil, defendant, under the original lease, stood not to receive revenue for a great many years to come; that defendant was willing to agree to a two-year suspension of all drilling requirements; that "they were under no obligation to drill anyway;" but that thereafter there should be a requirement that the lessee drill three wells a year when the price of oil was below 60 cents, as well as some provision for advance royalties. Tognazzini testified further that "Clause 7 [of the original lease] as such, or any other numerical paragraph was never mentioned" and that nothing was said at the conference as to what the drilling requirements would be after the two-year suspension whenever the price of oil should be above 60 cents; but on cross-examination, the witness admitted that Martin had stated that the drilling requirements under the original lease "were burdensome and prohibitory" and that Martin "in substance . . . again submitted the proposition that had been turned down which called for the drilling of three wells at the expiration of the two years if the price were sixty cents. . . ." According to the witness, the answer to this request was "that at the expiration of two years I would require that even though the price of oil be under sixty cents, there would have to be three wells drilled."

The director who testified at the trial, Francis L. Cross, testified that at the conference "Mr. Tognazzini and Mr. Martin did all the talking, Mr. Cooke and I merely sat in and listened to the conversation." His recollection of the discussion between Martin and Tognazzini was substantially the same as that of Tognazzini. This witness also testified that Martin brought up the question of a modification of the drilling requirement after the end of the two-year suspension period in the form of the plan outlined in the Twitchell letter, but that "Mr. Tognazzini told him unequivocally that that was out."

The deposition of the third director, F. O. Cooke, who did not testify at the trial, remains for consideration. He stated that paragraph 7 of the original lease was not mentioned at the conference; that Martin did not state that the lessee

wanted, in addition to a two-year suspension, "a modification of the lease so that they would [thereafter] only be required to complete three wells a year." When asked on cross-examination whether Martin suggested a modification along the lines of the Twitchell plan, Cooke stated that "I don't recollect. I think I will stand on that."

The foregoing evidence shows that there is support either for the conclusion that the question of modification of the drilling requirements after a two-year suspension of drilling was not raised at the San Francisco conference or for the conclusion that Martin suggested at the conference that the original lease should be modified along the lines outlined in the previous tentative understanding between Martin and Twitchell and that this suggestion was rejected.

In any event the points to be covered in a supplemental agreement were not decided upon in San Francisco. The negotiation continued by letters thereafter, and those letters comprehensively cover all the points finally agreed upon by the parties. The evidence is without conflict that the parties were unable to agree on the question of drilling requirements until some time after the San Francisco meeting.

The Twitchell plan should not be confused with the modification of drilling requirements proposed by Tognazzini in his letters of January 16, 1940, and January 25, 1940, accepted by Moore in his letter of January 29, 1940. The Twitchell plan reduced the drilling requirements to three wells a year when the price of oil was over 60 cents a barrel and suspended all drilling requirements except with respect to offset wells when the price of oil was below 60 cents a barrel and when other market conditions prevailed. This is the plan rejected by defendant. The counter proposal by Tognazzini was essentially different from the Twitchell plan in that Moore's drilling obligation (except for offset wells) was reduced to the drilling of three wells a year after two years and Moore was to drill these three wells regardless of the price of oil and other market conditions. This plan was not immediately accepted by Moore, for he wanted more concessions. (Moore's letter of January 25, 1940.) The concessions were refused, and in his letter of January 25, 1940, Tognazzini repeated the offer of January 16, 1940. This offer was accepted by Moore in his letter of January 29, 1940.

Defendant contends that a general finding that all allegations of plaintiff's complaint not found to be true are

untrue, is in effect a finding that at the San Francisco conference modification of the drilling requirements of the lease after a two-year suspension was not discussed because plaintiff alleged that it was discussed. Defendant cannot rely on the specific findings of the trial court with reference to this conference, however, for there is nothing in those findings to indicate that the parties agreed that clause 7 was not to be modified, and nothing therein from which a reasonable inference could be drawn in conflict with the letters. The evidence as to what occurred at the San Francisco conference was in conflict, and the findings may be construed to the effect that there was no discussion at that time of any modification of the drilling requirements of the lease after a two-year suspension. It does not follow, however, that it is reasonable to draw an inference that the modification of the drilling requirements was never discussed by the parties or their representatives. The evidence is without dispute that the modification of the lease was discussed by Martin and Twitchell before the conference, but that the plan for a modification was rejected. The evidence is without dispute that on Martin's return to California to continue negotiations, he was informed by Tognazzini before the conference in question that this plan was rejected. A few days after the conference, he wrote a letter again proposing a modification of paragraph 7. The proposal was again rejected, but the modification of the drilling requirements of paragraph 7 was considered in virtually every letter between the representatives of the parties. All this evidence is without conflict.

Only if the letters are disregarded could an inference be drawn from the testimony with respect to the San Francisco conference, that the parties never considered the modification of paragraph 7 and consequently did not intend clause 2 of the supplemental contract to be the measure of the lessee's drilling obligations. The letters cannot be disregarded, for the trial court found that they were mailed and received. There is no authority for the proposition that such an inference must be drawn to sustain the judgment. The defendant relies on the majority opinion in *Estate of Rule,* 25 Cal.2d 1, 10-11 [152 P.2d 1003, 155 A.L.R. 1319], but that case is not authority for such a conclusion. The doctrine of the Rule case is that, *"in the absence of findings of fact and conclusions of law,* every intendment is in favor of the judgment or order appealed from and it is presumed that every

fact or inference essential to the support of the order and *warranted by the evidence* was found by the court. . . . The rule is that an 'appellate court will accept or adhere to the interpretation [of a contract] adopted by the trial court—and not substitute another of its own—. . . where parol evidence was introduced in aid of its interpretation, and such evidence . . . is such that conflicting inferences may be drawn therefrom.' " (Italics added.) It is clear that this doctrine is inapplicable to the present case, for the trial court made extensive findings and conclusions of law with respect to the negotiations, including the letters and the intervening conference, and it cannot be assumed that the letters were not considered, for they were virtually incorporated into the findings. To apply the doctrine of the Rule case it would be necessary to infer that because there was no discussion of the modification at the San Francisco conference such a modification was never considered by the parties, and then to infer further that the parties did not intend such a modification.

Since the letters, which show that the parties considered such a modification, were found by the trial court to be mailed and received, the evidence is not reasonably susceptible of an inference that would support the judgment. (See *Estate of Platt*, 21 Cal.2d 343, 352 [131 P.2d 825] ; *Eastman Oil etc. Corp.* v. *Lane-Wells Co.*, 21 Cal.2d 872, 875 [136 P.2d 564].)

The defendant also contends that the judgment of the trial court is supported by the rule of construction embodied in Civil Code, section 1654 that "In cases of uncertainty not removed by the preceding rules [including section 1647 that a contract may be explained by reference to the circumstances under which it was made], the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party. . . ." This rule on its face cannot support the judgment in the present case. Clearly it cannot be applied against the lessee as the promisor, for a basic issue in the case is who was the promisor. Nor can it be said that the lessee caused the uncertainty to exist, for the evidence is without conflict that the precise modification was suggested by defendant's president in language that was copied almost verbatim into the formal document.[3]

---

[3]It has been suggested that this modification was proposed by Martin in a letter dated January 11, 1940. An examination of that letter, how-

Defendant also contends that a reasonable inference might be drawn in support of the trial court's conclusion from the fact that the formal document was drawn up by Moore's attorney. The basis for this contention seems to be that Martin as a competent attorney should have known that the lease would be interpreted in favor of defendant, and that, therefore, unless he intended that interpretation, he would have inserted certain words that would have removed any uncertainty. Such an inference, however, assumes that Martin was aware of the ambiguity. The provision in question was taken from Tognazzini's letter of January 16th. That letter seems clear and unambiguous, and when considered in the context thereof, the provision itself likewise appears clear and unambiguous. There is no reason to assume that Martin was any more aware of the possibility of this ambiguity than Tognazzini, who suggested the modification and who signed the formal document without suggesting any changes in the disputed provision. There is no reason to assume that Tognazzini is any less competent than Martin, and it is difficult to comprehend why he did not insert into his proposal or into the formal document the words that defendant now claims must be read into the instrument. It certainly is not reasonable to support the judgment of the trial court on the basis of some appraisal of the relative competence of these two men.

The determination of the trial court that the lease as modified is capable of only one construction and that the parties intended that the drilling requirement of paragraph 7 would not be modified by clause 2 of the ''Supplemental Contract'' are without support in the evidence or any reasonable inference from the evidence. The specific findings as to the negotiations, and the evidence, which is without conflict in any essential element and not reasonably susceptible of conflicting inferences, show clearly that the parties intended to modify paragraph 7 of the original lease. It follows that the trial court's construction of the lease is erroneous.

The judgment is reversed.

Gibson, C. J., Edmonds, J., and Spence, J., concurred.

SCHAUER, J.—I dissent. In the briefs of the parties, the opinion of the District Court of Appeal (173 P.2d 700) and the majority opinion of this court, we find an aggre-

---

ever, see footnote 2, *supra,* reveals that the modification there suggested, based on the price of oil and other market conditions, was clearly not the modification incorporated into the ''Supplemental Contract.''

gate of hundreds of pages of legal discussion. And, unfortunately, all of it together is of little benefit to the parties or to the law because in the final analysis the sole determinative question, in the view of the majority of this court, at least, relates only to sufficiency of the evidence to support findings of the trial court and its construction of a written agreement. Apologetically I add to the fruitless discussion, impelled thereto by the unrelenting conviction that the loser in any lawsuit on appeal is entitled to an adequate and fair factual statement by the reviewing court and to a decision which reckons with the record as it is.

Reading of the entire record convinces me that in reality the majority of this court reach their result not because the evidence as a matter of law is insufficient to sustain any essential finding of fact or the trial court's construction of the agreement but because, after weighing the sharply and substantially conflicting evidence, they have concluded that, as they view it, the greater weight of the evidence favors plaintiff and, hence, that the justice of the cause demands a reversal of the judgment. I am unable to concur in a judgment of reversal which on any fair statement of the evidence can be supported on no other theory.

The facts essential to an adequate understanding of the controversy are few and simple. The plaintiff oil company is lessee by assignment under an oil lease executed by defendant owner-lessor; the lease was modified and augmented by a supplemental agreement affecting the drilling obligations of the lessee; a dispute subsequently arose as to whether the provisions of the original lease relative to the number of strings of drilling tools to be operated continuously were abrogated and replaced by a provision of the supplemental agreement relative to a minimum number of wells to be *completed* each year. To determine that dispute this action for declaratory relief was brought.

Since, as above indicated, the issues in this case are either actually factual or are made so by the majority opinion, it becomes important at once to recognize what those issues are, what the evidence is, and, in particular, to set out *in haec verba* the language which the parties used and which is the subject of construction.

Plaintiff in its petition for hearing declares that "The heart of the controversy is the clause of the original lease fixing the lessee's drilling obligations after the discovery of oil and gas in paying quantities. That clause, No. 7, specified (1)

the total number of wells that the lessee was to drill—one well to each ten acres [of a 6700 acre lease]—and (2) the rate at which the lessee was to drill this number, namely: 'Lessee agrees to continuously operate one string of tools with due diligence for the first year after such discovery, two strings of tools for the second year after such discovery, three strings of tools for the third year after such discovery, four strings of tools for the fourth year after such discovery, and five strings of tools thereafter until the drilling requirements herein specified are complied with.' '' The foregoing requirement for operating, progressively, one to five strings of tools ''imposed on the lessee the burden of spending from $180,000 the first year to $900,000 in the fifth and each subsequent year.'' The lease, as previously indicated, covers some 6,700 acres of land and, hence, unless surrendered in whole or in part, will entail the drilling of some 670 wells plus, possibly, conditionally required offset wells. Such original lease does not appear on its face to be unfair in any respect; it sets up various reciprocal rights and obligations in considerable detail; the drilling schedule above quoted is not an absolute obligation of the lessee; it can be relieved therefrom at any time by surrendering the lease and its rights thereunder; there is provision also for temporary suspension of its drilling obligations under certain specified conditions.

The actual nub of this controversy lies in the present lessee's claim that the ''Supplemental Contract'' eliminates completely and permanently the above quoted original contract provisions relative to the number of strings of tools to be operated in developing the property. The language of the ''Supplemental Contract'' so relied upon by the plaintiff-lessee, and now by the majority of the court, is as follows: ''It is agreed between Union Sugar Company . . . and E. H. Moore, Inc., . . . that oil and gas lease dated April 8, 1936, from Union Sugar Company, lessor, to Sovereign Oil Corporation, lessee . . . be, and same is hereby, modified in the following respects, to-wit:

''(1) All obligations to drill additional wells, except offset wells, are hereby suspended for a period of two years from February 1, 1940.

''(2) At the expiration of said two year period, Moore shall be obligated to complete three wells per year.

"(3) Numerical Paragraph Nine (9) of the lease [relating to offset wells] of April 8, 1936, shall be modified by striking out '250 feet' wherever the same appears therein, and inserting in lieu thereof '330 feet.'

"(4) Commencing from the date of this supplemental contract, Moore agrees to pay a minimum royalty of $25,000.00 per year, payable monthly in advance, and said royalty shall be charged against the total oil reserves during the course of the life of the lease; that is to say, Moore shall be entitled to all oil and/or gas produced from said lease, or the proceeds thereof, until it is fully reimbursed from lessors' one-eighth royalty interest for the minimum royalty so paid.

"(5) Except insofar as the provisions of the lease of April 8, 1936, are in conflict herewith, the same shall remain in full force and effect."

Particularly is it to be noted that the above-quoted supplemental agreement is utterly silent as to the number of strings of tools to be operated after the drilling holiday. It provides that "(1) All obligations to drill additional wells, except offset wells, are hereby *suspended for a period of two years* from February 1, 1940." (Italics added.) The holiday, according to its terms, is a temporary suspension or moratorium, not an abrogation for the entire remaining term of the lease. But the effect of the majority holding is not to enforce any two-year suspension of the terms of the original lease; it is rather to permanently abrogate, insofar as the terms of the original lease are concerned, "All obligations to drill additional wells, except offset wells"; that is to say, by the majority holding the drilling obligations (other than for offset wells) declared in the original lease are completely eliminated and the only drilling obligation (except for offset wells) now operative is that stated in the "Supplemental Contract," which is to "*complete* three wells per year." (Whether in the view of the majority any offset wells completed during a year should be credited on the "complete-three-wells" program does not clearly appear.) The supplemental agreement language is: "(2) At the expiration of said two year period, Moore shall be obligated to *complete* three wells per year." (Italics added.) This language, viewed in its context, would seem to me to mean that "at the expiration" of the *two-year suspension* of "All obligations to drill additional wells, except offset wells," the lessee was to be obligated, regardless of the price of oil, of the number of strings of tools otherwise required to be operated, of the depth of hole required, of the

character of formation encountered, or, etc., to, *at the least,* *"complete* three wells per year.'' (The same paragraph of the lease (No. 7) which provides for the number of strings of tools to be *continuously operated* after discovery of oil also provides that ''The Lessee shall be entitled to drill as many additional wells on said land and premises as it desires.'')

Certainly it cannot successfully be contended that the language of the supplemental contract precludes the meaning above suggested. If that meaning is not precluded by such language we are bound to accept it for it was found by the trial court to be the true meaning of the language and the true agreement of the parties and such finding is amply supported by both direct and circumstantial evidence. As recounted hereinafter in more detail the record shows that Mr. Cooke, a director of defendant-lessor who participated in the negotiations leading up to the modification agreement, testified in respect to the terms agreed upon that ''if we were going to give them a release on drilling of wells for two years . . . that they had to start and drill at least—I want to make particular emphasis on that word 'at least'—three wells a year. . . . [And] *if the price of oil was more than 60 cents* *. . . we expected them to go ahead on the original lease, under* *that Clause Seven.* . . . [Italics added.] [T]hree wells were to be drilled [per year] . . . Regardless of whether the price of oil was 60 cents or less.'' Likewise, as hereinafter shown in more particularity, the witness Cross testified as to the terms of modification agreed upon that ''if they were given a two year suspension, would have to agree to drill and complete at least three wells per year if the price of oil was under sixty cents. . . . There was absolutely no discussion of Paragraph seven of the lease. . . .'' Any failure to discuss paragraph 7 at this time would seem to me to indicate that the repeated earlier refusals of defendant's directors to modify the drilling covenants beyond the two-year moratorium were accepted by Mr. Martin as final; and insofar as Martin may have again attempted to bring the subject up the positive refusal by defendant's directors to give it further consideration (as suggested by evidence hereinafter quoted) is likewise suggestive that the supplemental agreement means what it says rather than what the majority now interpolate into it.

I look in vain to the supplemental agreement for a provision saying that ''the suspension of 'All obligations to drill

additional wells, except offset wells' is hereby made permanent"; or that "the provisions of the original lease requiring the continuous operation with due diligence of five strings of tools 'until the drilling requirements herein specified [one well to each 10 acres] are complied with,' " are suspended and inoperative not only for two years but for the entire remainder of the term of the lease. I look in vain for the above but I find, " (5) Except insofar as the provisions of the lease of April 8, 1936, are in conflict herewith, the same shall remain in full force and effect."

It is obvious from an inspection of the original lease and of the supplemental agreement that the latter on its face, construed as it must be with the document which it avowedly supplements, does not purport to support the theory of, or the result reached in, the majority opinion; it does not appear to be ambiguous or uncertain or to admit of the construction or effect now urged by plaintiff; on its face it does appear to fully sustain the construction given it by the trial court. Nevertheless, says plaintiff, if the extrinsic evidence is considered,[1] the only reasonable conclusion which can be drawn from it is that the parties to the lease really agreed to modify and supplement it in one element at least which is drastically different from anything which the language used seems calculated to delineate. In fact, the plaintiff urges, and the majority opinion now argues, that the major object which the plaintiff[2] sought to obtain in consenting to any change in the original lease was a *permanent* release, rather than a *two-year suspension,* of its drilling obligations as provided in the original lease. The vast difference between a two-year suspension of the agreed drilling obligations and complete release therefrom with substitution of a mere three-well yearly *completion* schedule will at once be apparent to anyone who has any intimate acquaintance with the oil production business and who pauses to consider the facts of this case.

Here we have a 6,700 acre lease with the lessee obligated, by the terms of the lease as originally executed, to develop the land with reasonable expedition by continuous operation during the fifth and subsequent years after discovery of oil

---

[1] For the purposes of this dissent the admissibility of such extrinsic evidence is assumed but this does not imply accord with the holding that it was properly admitted.

[2] The word plaintiff is used herein interchangeably as denoting either the present plaintiff or its predecessor in interest under the lease from defendant.

or gas in paying quantities, of five strings of tools "with due diligence." How many wells might be completed each year by the operation of five strings of tools is, of course, a variable. Whether one hole can be completed in three weeks, three months or three years depends not only on the diligence and skill of the workers but also on the type of equipment used, the character of the geological formations encountered and the depth of the oil sand from which production, if any, eventually is obtained. There is evidence here that the operation of five strings might produce as many as 15 wells a year; it could, of course, *complete* less than three. At 15 wells a year to fully develop the lease (without allowance for unusual delays) would require approximately 45 years. If plaintiff prevails and can maintain the lease by completing only three wells a year—if that is tantamount to saying it need drill only three holes a year—it will require 223 years to put defendant's land on full production! With such a seemingly absurd result, from defendant's standpoint, to be made possible from the interpretation urged by plaintiff, and with that interpretation to be read into language which does not, by itself, even remotely suggest it, one should expect that the evidence requiring such a construction (if, indeed, there be any known theory of law which permits it) must indeed be overwhelming and without conflict. But in truth the most that can be said for plaintiff is that the evidence is in sharp conflict.

The majority opinion on its very face recites evidence which, if fairly analyzed, according to all heretofore accepted standards would require that the findings of the trial court and its construction of the contracts be sustained. Such discussion of the evidence as appears in the majority opinion, insofar as it is objective, is obviously argumentative as to the differing inferences which may be drawn from the evidence. In other words the thesis of the majority opinion constitutes a mere argument on the weight of the evidence, the resolution of its conflicts, and the selection of inferences to be drawn therefrom, matters which are no concern of a reviewing court. But my greatest quarrel with the majority opinion comes not from evidence which it discusses but, rather, from evidence which it leaves unquoted.

The record discloses that at the time of the negotiations for the modifications to the lease the following circumstances existed: The then lessee, E. H. Moore, Incorporated, a one-

man corporation, was dissatisfied with marketing conditions at the defendant's field. Moore was dissatisfied largely because the present lessee (plaintiff here) was the only crude oil purchaser available and, as such, had fixed an arbitrarily low price which Moore had no alternative but to accept if he was to produce and market oil in that field. By way of remedying that situation Moore conceived the plan of building a refinery at the field so that he could handle his own production. According to the record a two-year moratorium or "holiday" in drilling requirements would enable him to devote toward the building of a refinery some. $1,800,000 in cash which otherwise might have to be expended in drilling new wells. Although at that time the oil company was offering less than 60 cents a barrel for the oil being produced by Moore from defendant's field, and although the obligation of the lessee to operate the five strings of tools was suspended while the price was below 60 cents, there was, of course, nothing to prevent the oil company from raising the price to 60 cents or more at any time it saw fit so to do. To the end of securing some modification in the drilling program—at least security against having to drill any but offset wells for a two-year period during which a refinery might be built—Moore commenced negotiations with representatives of defendant. In most of these negotiations Moore was represented by Mr. Villard Martin, an attorney at law. In the initial negotiations Mr. Martin broached the matter to Mr. Edmunds Lyman, who was then president of the defendant lessor; Mr. Lyman referred Mr. Martin to Mr. T. A. Twitchell, an attorney at law; Mr. Martin thereupon conferred with Mr. Twitchell and stated the desires of the Moore Company; Mr. Twitchell then prepared a memorandum of the proposition suggested by Martin and forwarded it to the offices of the lessor at San Francisco. This proposition is sometimes referred to in the record and herein as the "Twitchell deal" or proposal, and because of the repeated references to it by some of the witnesses at the trial its substance is of importance to bear in mind in any appraisal of the sufficiency or weight of the evidence relative to supporting or failing to support the judgment.

Mr. Twitchell, in his report to the lessor (under date of October 14, 1939, received in evidence as plaintiff's Exhibit No. 5), said: "Mr. Villard Martin, attorney for Mr. Moore, was here Thursday discussing the possibility of modifying

the oil and gas lease between the company as lessor, and Mr. Moore as lessee. Mr. Moore desires to construct a topping plant to handle the oil from the lease, but does not desire to spend the money required to build this plant if he has to comply with the existing drilling requirements of the lease. If Moore constructs a topping plant it will be to the advantage of the Union Sugar Company because it will create an outlet for oil, and this in turn will mean immediate revenue for the company as lessor. . . .

"I informed Mr. Martin that I would submit the proposal to you, and that you in turn would submit it to the Board of Directors.

"Mr. Martin originally proposed to modify the drilling requirements so that Mr. Moore would only be required to develop the lease in accordance with good oil field practice. Many old oil leases did not contain any express drilling requirements, and in those leases the Courts uniformly held that there was an implied obligation to drill when conditions warranted further drilling. . . .

"I informed Mr. Martin that I could not recommend that the lease be modified in this way. After discussion, we arrived at the following tentative plan:

"1. The Union Sugar Company shall agree to suspend all drilling obligations for a period of two years, except the obligation to drill offset wells. . . .

"2. The existing proven area, comprising some 400 acres, would be zoned and in that zone, after two years, Moore would be required to drill 3 wells per year, provided that the price of oil is 60c or more per barrel at the well. . . .

"The provision calling for three wells per year was inserted because three wells per year would be all that Moore would be required to drill, assuming that he was operating with one string of tools. Martin said he might desire to drill three wells all at one time under contract, rather than to allow 90 days to elapse between wells, as provided in the lease.

"3. Moore would not be obligated to drill any additional wells . . . outside of the proven area, unless oil should be discovered on the property or *or* adjacent property at such locations that it would appear probable that oil could be discovered and produced from a portion of the unproven area. . . .

"I also believe that it would be advisable to provide that the agreement would be null and void if Moore assigned or transferred the lease to some third person. . . ."

It is obvious from mere perusal of the above-quoted report that even the "Twitchell deal," although it definitely called for a modification of the five-strings-of-tools development program, certainly contemplated more extensive drilling obligations than the three-wells-a-year now held by the majority to have been agreed upon. But as will appear from evidence hereinafter quoted the "Twitchell deal" was rejected by the defendant's directors because they would not grant such an extensive release from the drilling obligations declared in the original lease. Following the Twitchell report Mr. Lyman was succeeded by Mr. Tognazzini as president of the Union Sugar Company, and Mr. Martin arranged for a conference directly with Mr. Tognazzini. The latter called in Mr. Cooke and Mr. Cross, directors of the defendant company, and the conference was held at the Stock Exchange Club in San Francisco, on December 20, 1939.

According to Mr. Tognazzini's testimony Mr. Martin "asked me about the modification, what action had been taken on the proposal that had been submitted to us by Mr. Twitchell. . . . And I told him that the proposition had been turned down cold by the Board of Directors. . . . Mr. Martin opened up the subject again about a modification and he elaborated at length on the large amount of money that had been expended by E. H. Moore, Incorporated, and the difficulties that they had encountered in disposing of the oil, stating that the arrangements as they existed in the Santa Maria Field by virtue of the only outlet being that of the Union Oil Company, had made it unsatisfactory. . . . He stated that they needed to obtain an outlet and one method would be to establish a refinery or some similar institution of their own; that they had gone to the expense of discussing the same with a firm of engineers in Los Angeles; that they were prepared to go ahead with that, but in view of the large sum of money that would have to be expended for the erection of a refinery, and that he thought there was a possibility of the price of oil going up again, that he wished to have the lease modified so that there would be a complete suspension of drilling operations for two years. . . . I told him that most of the leases in the Santa Maria Valley Field were more favorable to the lessor than that which the Union Sugar Company had. . . . I told him further, as I recall, that the Union Oil Company controlled that field, that I was indignant over the attitude of the Union Oil Company who

had had a posted price of seventy cents in that field; . . . that any analysis disclosed that there were twenty-three or twenty-four oil fields throughout the State of California the price on which oil of comparable gravity was within a few cents of this seventy cent range; that the Union Oil Company, for reasons best known to themselves, arbitrarily reduced the price of oil in this particular field which they controlled to below fifty cents; that in no other field in the State of California would you find a comparable reduction or price for comparable oil. . . . I told him further that he might be of the opinion that the price of oil would go up, which would necessitate a resumption of drilling, but I was going to protect the interests of the Union Sugar Company in the event the price of oil did not go up. So I made it very clear to him that so far as we were concerned, we would permit, if all parties could agree upon the terms and conditions of this two year suspension. They were under no obligation to drill anyway. It was only on a basis of an anticipated increase in the price of oil that they might have to drill at this particular stage of the game. I told him that in the event we could agree that there must be a provision whereby there would be the drilling of three wells per year when the price of oil was below sixty cents. We did not arrive at that particular meeting at the monetary consideration to be paid to us. I advanced the theory that there was proven production and whatever monetary consideration would be given to us was really not a consideration for the reason that it would be only an advance of money to us on our own production or proven oil reserves to be charged against those reserves as time went on. That statement came about in answer to this unit plan or some such plan that had been discussed in the Twitchell letter and again had been discussed almost verbatim at this meeting. . . ."

The witness continued, "Since Twitchell's letter is in the testimony, I guess we can refer to it. In the Twitchell letter there was a statement made that they be permitted, or that there be a suspension of drilling requirements for two years and at the expiration of that time, if the price of oil be sixty cents or more, that three wells be drilled.

"Q. Yes? A. At this meeting I took just the opposite position because we turned down that proposition cold, that at the expiration of two years three wells must be completed if the price of oil be below sixty cents. That's all we were talking

about. That's all that I was talking about, and that there be this minimum revenue coming in, not only during the two years which was a condition for the suspension for a two year period in order to give relief in the event the price of oil went up, in view of the contemplated erection of a refinery, that at the expiration of that two year period if the price of oil still be below sixty cents, then I wanted three wells to be drilled on that property per year. . . .

"Q. Was anything said during that discussion as to what drilling requirements would be if the price of oil was above sixty cents after the expiration of the two year period? A. No, nothing whatsoever. We had turned down the proposition that there be three wells drilled if the price were over sixty cents. The lease provisions prevailed if the price were over sixty cents. What was being asked was a respite for two years because of the fear that the price of oil was going to go up again which then would require the drilling and producing of that field. Now that's what the whole discussion was about at this particular meeting and the proposition was made, or the play on our sympathies was made, showing how much money had been expended, how they were unable to have an outlet because of the activities of the Union Oil Company in that particular field and how therefore it was necessary for them to erect a refinery in order to obtain an outlet of their own. And while they were erecting all that, going to all that further expense, Mr. Martin stated definitely he anticipated an increase in the price of oil. In that respect he was correct, because there was an increase in the early part of 1941.

"Q. Did they, as a matter of fact, erect a refinery? A. No."

In corroboration of the testimony of Mr. Tognazzini we find the testimony of Mr. Cooke:

"As I say, we were gathered downstairs, and Mr. Martin said he had come here at the instance of Mr. Moore to see if something could not be done to help out the situation, which was getting rather critical at that time.

"Q. Did he explain in what respect the situation was getting critical, do you recall? A. Yes, the oil situation had changed there and he found he needed relief, one way or another; had to have relief from drilling some oil wells he should have to drill under his contract, and he stressed quite a point on that; that he would like us to consider making some

change in that, and that he would probably have to put in a refinery. That was the thing that struck me. There were two or three things Martin had on his mind. One was, he figured, he tried to get it over to all of us, that Mr. Moore would have to spend a lot of money for this refinery, and if he did that he felt he should have some relief on the drilling of the wells.

"Q. Did he explain why he thought he would have to have a refinery? A. Yes, there was no way of getting his oil out at that time; the marketing conditions bothered him. Mr. Tognazzini did most of the talking to him at that time. We really sat back and listened, except when it got near the end we went in on a few things, made some suggestions and worked them out, and as far as I remember—do you want me to try and dig up some of the statements?

"MR. BRANDT: As far as the sum and substance of it goes. A. (Continuing:) The sum and substance was: You must realize we had had nothing under this oil business, and we felt that we should have an adjustment made there that was fair to us and fair to the Moore people. If I remember rightly, they started to and drilled approximately, when they asked for this meeting, I think it was twelve wells, and out of these 12 wells, I think 10 were operating and 2 were dry, or not in good condition. I don't know the technical condition, but they were not on production, let's say that, and he, Mr. Martin, seemed to feel that we should give them this 2-year extension whereby they didn't drill any wells. They wanted relief. Well, we didn't give them any definite answer at that time, because there were other things he was going to bring up—Mr. Tognazzini was going to bring up—and that was the matter of us getting some money on a royalty basis. We felt we should have that, and also we felt if we were going to give them a release on drilling of wells for two years, that under no circumstances were we going to allow them at the end of that time not to live up to their agreement, that they positively had to live up to their agreement, which was, in fact, that they had to start and drill at least— I want to make particular emphasis on that word 'at least'— three wells a year.

"Q. At the end of the two years? A. At the end of the two years. . . .

"Q. Did Mr. Tognazzini in the conversation refer to

the extent of the acreage leased? A. Yes, I think he mentioned that we had leased Mr. Moore some 6700 acres.

"Q. That they were included in the lease? A. Included in the lease.

"Q. Do you recall whether anything was said concerning the then price of oil? A. He was very insistent on that point, because, as I remember, he made the statement that no matter what the price of oil was, that the Moore Company were still obligated to drill three wells—at least three wells—a year, irrespective of the price of oil. . . .

"Q. And did Mr. Martin, as you recall, mention the possibility that oil might increase in price while building their refinery? A. Yes, he did.

"Q. What did he say in that connection? A. He said that he would like to have two years and be released from that drilling, but he said the oil might go up—I don't think he said any particular price as to what the oil might go up to—but we came right back to the same thing, that irrespective of the price of oil we still say you will have to drill at least three wells a year.

"Q. Now, during the conversation was there anything that you recall, Mr. Cooke, mentioned concerning the number of drilling rigs at any time? A. No, no.

"Q. Was there any mention that you can now recall concerning Paragraph Seven of the lease as such? A. I think that was a clause—Seven, was it?

"Q. Clause Seven? A. Clause Seven; no, no mention at all.

"Q. Was there any discussion about the number of rigs that were to be used after the expiration of the 2-year period? A. No sir.

"Q. Did Mr. Martin state to you people, you directors there and to Mr. Tognazzini, that he wanted a suspension of drilling operations for two years, and on top of that wanted a new agreement with respect to future operations? . . . A. No.

"Q. Did Mr. Martin ask that in addition to suspension, that the lease be modified to reduce the number of strings of tools required to be used or the number of wells to be drilled? A. No.

"Q. Did Mr. Martin say at that time that it was his purpose to secure a complete suspension for two years, and thereafter secure a modification of the lease, so that they would only be required to complete three wells a year? A. No.

"Q. Did he say, did Mr. Martin say, he wanted to get the lease modified so that they would not be required to keep the number of strings of tools busy as provided in Paragraph Seven of the lease? A. No."

On cross-examination of Mr. Cooke by plaintiff's counsel, he was shown a copy of Mr. Martin's testimony as given in a deposition and an effort was made to break down his testimony. The record reflects the following:

"Q. I will again refer to Mr. Martin's deposition on page 70. Mr. Martin stated: 'I told them I was up there to get a modification of that lease.

" 'Q. What kind of a modification did you tell them you were after?

" 'A. I told them I wanted to get that lease modified so that we would not be required to keep the number of strings of tools busy that are provided for in Paragraph Seven of the lease.'

"A. My answer to that is 'no.'

"Q. That he didn't make that statement? A. No, he did not make that statement. . . .

"Q. And I will also ask you, then, if you recall, or if you are prepared to state, that he didn't state at the conference as follows: . . . 'The discussion there was that after the expiration of the 2-year period under this proposal that we made there and this supplemental agreement we had submitted, we were going to have to drill three wells each year, regardless.

" 'Q. It was your proposition, then, to them that you have a limit as to the number of wells after the expiration of the two years?'

"THE WITNESS: No, no.

"MR. POWELL: I am just reading, I have not come to the point as yet in the question asked Mr. Martin in his deposition.

" 'A. That is right, three wells a year after the expiration of the two years was the limit of our drilling requirements.'

"THE WITNESS: Oh no, no.

"MR. POWELL: Q. You are prepared to say definitely? A. He is confused on that.

"Q. Are you prepared to say that Mr. Martin did not make that statement? A. Yes. . . .

"Q. Then I will ask you, Mr. Cooke, if at this conference Mr. Martin stated that the only change in the lease they

wanted was a suspension of two years in drilling? A. Two years?

"Q. A two years' suspension in drilling obligations? A. I think that is correct, yes.

"Q. He stated that was all .that he was seeking? A. At that time, yes.

"Q. A two years' suspension in drilling, nothing else? A. No. . . .

"Q. What was to happen if the price was more than 60 cents? A. That wasn't referred to at all. We expected them to go ahead on the original lease, under that Clause Seven that you speak of, but Moore never mentioned Clause Seven.

"Q. You stated just now that three wells were to be drilled regardless of the price of oil, I think that is your precise language. Do you mean regardless of whether the price was less or more than 60 cents a barrel? A. Regardless of whether the price of oil was 60 cents or less."

The foregoing quoted matters from the testimony of the witness Cooke are only a part, but a fairly illustrative part, of his positive and material testimony which the majority opinion dismisses as insufficient to create a substantial conflict in the evidence of surrounding circumstances from which circumstances such opinion interprets the "Supplemental Contract" to mean what the witness Martin asserts he asked for but which the contract does not state and which the witness Cooke, as well as the witness Tognazzini, testified Martin in part did not ask for and in part asked for but was refused.

And the gist of the testimony of the witnesses Tognazzini and Cooke is corroborated by another witness, Mr. Francis L. Cross, a member of the State Bar and a director of the defendant-lessor. Mr. Cross was among those present at the San Francisco conference, which lasted "from around noon to three-thirty, a quarter to four, sometime there." The transcript shows: "Q. Now can you give us, in substance, Mr. Cross, your recollection of that discussion? What did Mr. Martin, in substance say, and what did Mr. Tognazzini, in substance say?

"A. Well sir, Mr. Martin discussed the question of the oil lease he had with us and that at the time it was very onerous; that they had spent a substantial amount of money on this lease and they weren't very happy in that regard. That was the sum and substance of what he had to say.

"Q. Did he say anything about a refinery? A. Yes, he spoke of building a refinery in rather positive terms, had an engineering architect who was going ahead with this refinery.

"Q. Yes, well, did he make any suggestions as to what he wanted? A. Mr. Martin spoke of these matters first and stated that they wanted a two year suspension of a drilling clause.

"Q. Yes? A. They wanted relief for two years from having to drill. That was the sum and substance of his entire conversation, the crux of it.

"Q. What, if anything, did Mr. Tognazzini say? A. Well, Mr. Tognazzini did quite a bit of talking and told Mr. Moore that he was new in the Union Sugar Company, which was a fact, and was looking after the interests of the Union Sugar Company and he went into great lengths to show what had happened in the Gato Ridge to his cousin, Lario Tognazzini, and he was not going to allow the Union Sugar Company to get in that same position; that he wanted some payment. No payment was mentioned,—no specific payment was mentioned but that he wanted some payment and that in any event the Oil Company, E. H. Moore, Inc., if they were given a two year suspension, would have to agree to drill and complete at least three wells per year if the price of oil was under sixty cents.

"Q. And was there any discussion as to what drilling would be required at the expiration of the two year period, during the period when the price was above sixty cents? A. There was absolutely no discussion of that at all. It wasn't mentioned.

"Q. Was there any discussion that you recall concerning Paragraph Seven of the lease? A. There was absolutely no discussion of Paragraph Seven of the lease.

"Q. Was there anything said that you recall at that conference concerning the number of drilling rigs to be used? A. No, I don't recall any mention of any drilling rigs or anything like that."

It is also significant to note that on cross-examination of Mr. Cross the following appears: "Now, Mr. Cross, I understand from you that all Mr. Martin wanted was a two year suspension in drilling; nothing else?

"A. Mr. Martin talked about getting relief for two years. It is true that during this conversation he brought up the Twitchell deal, that they had been trying to put through with Twitchell. Mr. Tognazzini told him unequivocally that that was out." The unequivocal refusal to consider "the Twitchell deal" imports a refusal by defendant-lessor to consider the three-well-a-year proposal *as a substitute* for the more specific drilling operations provided for in the lease.

Again on cross-examination Mr. Cross was asked, "Now did Mr. Martin ask for any reduction in the drilling requirements at the expiration of the two years?" And he answered, "No," with the explanation that "He . . . tried to bring it [the Twitchell deal] up again, the deal that he wanted to put over with the Union Sugar Company that was turned down. He again brought that up and was again turned down. . . ."

In what is essentially an argument directed at the weight of conflicting evidence Justice Traynor declares, "Only if the letters are disregarded could an inference be drawn from the testimony with respect to the San Francisco conference, that the parties never considered the modification of paragraph 7 and consequently did not intend clause 2 of the Supplemental Contract to be the measure of the lessee's drilling obligations. The letters cannot be disregarded, for the trial court found that they were mailed and received. There is no authority for the proposition that such an inference must be drawn to sustain the judgment." The above-quoted argument misses the point completely. The evidence in the record which I have above referred to and quoted in part was not relied on by the trial judge, as "support for an inference that the parties never considered such a modification." Exactly the contrary is true. The evidence is positive to the point that Mr. Martin, representing Mr. Moore, requested "such a modification" *originally and repeatedly* and that such request *was rejected and refused* by the directors of defendant corporation. Only in the sense that they absolutely refused such proposal by Mr. Martin did they decline to "consider" it. They did so refuse to consider it, in that sense, and apparently they continued to so refuse down to and including the time when the modification agreement was executed.

The oral testimonies of the directors show the terms of the agreement which were discussed and tentatively accepted; such testimonies show what was refused and what was not

refused; their version of the conference corresponds with the terms of the "Supplemental Contract" as it actually was finally drafted and executed, *not* as plaintiff would now have us "construe" or interpolate it. Obviously the inferences to be drawn from such evidence, within all reasonable limits, were for the trial court, not this court, to determine; and surely it is within reasonable limits to draw the inference that a proposed modification which was requested by Mr. Martin and absolutely and positively rejected and refused by the three directors of defendant corporation at the principal conference held would not be gratuitously or otherwise revived and granted by those same directors when they came to actually authorizing the amending contract. And, furthermore, if Tognazzini, acting alone, did talk about the matter further, by letters or otherwise, it was for the trial judge to determine from all the evidence (if any was admissible under the circumstances) what terms were finally agreed upon. The contract *is itself* evidence of its terms and of what the parties intended; in its final form it was drafted by Martin; the language was in large part the same as he had previously proposed; language which he previously had proposed to secure more extensive modifications, or an abrogation, of the drilling requirements of paragraph 7, significantly, was omitted from the final draft. The weight of the contract itself as evidence is completely ignored in the majority opinion but its significance as evidence is corroborated by the testimonies of Cooke and Cross and Tognazzini and by circumstantial evidence.

The fact that the court found that certain letters "were mailed and received" does not appear to me to add anything to the significance of those letters as evidence. Their weight or significance here depends not on the fact of their having been mailed and received but on what the trial court believed, and was supported by the evidence in believing, the writer of the letters and their recipient understood was being agreed upon by way of modification of or supplement to the original lease. Just why statements in letters by Mr. Tognazzini should be overwhelming in weight while the oral testimonies of Mr. Tognazzini, Mr. Cooke and Mr. Cross *as to what was tentatively agreed upon and what was positively rejected* should be entitled to no weight at all is beyond me. The fact is that the testimonies of Mr. Cross and Mr. Cooke support strongly (and amply as regards the duty of an appel-

late court to affirm) the terms of the agreement as stated in the language of the contract as executed and as found by the trial court. The letters are not the contract which was executed. They are in evidence, like the oral testimony, simply as parts of the surrounding circumstances. The letters themselves are not free from ambiguities and self-contained conflicts. They are entitled to no greater weight than the trial judge, in the light of all the evidence including his view of the parties, gave to them. Surely the formally executed contract, supported by the oral testimonies of the several witnesses, should be as competent evidence of what was meant by the letters as the letters are of what was meant by the contract. Surely, also, the persuasiveness of such evidence was a question for the trial court, not for us. The oral testimony is entitled to just as much weight, as far as we are concerned, as the written letters. The oral testimony strongly indicates that the true contract is that which was actually reduced to writing rather than that which is now by judicial fiat interpolated therein.

A further example of weakness in the majority opinion is found in its effort to explain away application of section 1654 of the Civil Code providing that "In cases of uncertainty not removed by the preceding rules [including section 1647 that a contract may be explained by reference to the circumstances under which it was made], the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promissor is presumed to be such party. . . ." After quoting the section as above, Justice Traynor's opinion asserts that "This rule on its face cannot support the judgment in the present case. Clearly it cannot be applied against the lessee as the promissor, for a basic issue in the case is who was the promissor. Nor can it be said that the lessee caused the uncertainty to exist, *for the evidence is without conflict that the precise modification was suggested by defendant's president* in language that was copied almost verbatim into the formal document." (Italics added.) It is true that the language "almost verbatim" is to be found in the letter written by "defendant's president." But it requires very little more diligence in examining the record to ascertain that an earlier source of the same language is a letter written by plaintiff's Mr. Martin to defendant's Mr. Tognazzini. Mr. Martin there says: "Dear Mr. Tognazzini: Delay in writing you has been due to Mr. Moore's and my absence from Tulsa.

. . . I reported to him the substance of my conversation with you and Messrs. Cook and Cross, and he asked that I write you outlining briefly the terms of a supplemental contract along the line of my conversation with you.

"We proposed to embody the following in said supplemental contract: . . . All obligations to drill additional wells, except offset wells, are hereby suspended for a period of two years from the date of this contract.

"At the expiration of said two year period, Moore shall be obligated to drill three wells per year in any area consisting of approximately 400 acres, being that part of the leased premises which is considered proven territory . . . except that Moore shall not be obligated to drill during the existence of either of [certain enumerated conditions]. . . .

"There shall be no obligation to drill any additional wells on that part of the leased property outside of the proven area . . . unless oil is discovered on said property. . . .

"Except insofar as the provisions of the lease of April 8, 1936, are in conflict herewith, the same shall remain in full force and effect."

Mr. Tognazzini replied as follows: "In response to yours of the 11th, may I first advise that the terms and conditions contained therein are unsatisfactory.

"It was my impression from past conversations you had with my predecessor, and more recently, with Messrs. Cooke, Cross, and me that it was the desire of E. H. Moore Inc. to obtain a modification of the present oil and gas lease existing between E. H. Moore Inc. and the Union Sugar Company. In this connection, I expressed to you at our recent meeting that Union Sugar Company was desirous of cooperating with E. H. Moore Inc., but only to the extent that both parties were to benefit mutually by said modification." It is only after the above-quoted introductory statements, and in the light of all the preceding negotiations of the parties, that Mr. Tognazzini went on to summarize what he understood to be Mr. Martin's "desire" and what he understood was the "desire" of the defendant lessor, and after such statement of what obviously had been largely opposing "desires," he concluded with the following suggestion: "Both you and I, in obtaining a modification, desire to reduce it to its simples [sic] form and to this extent I suggest the following, to-wit:

"(1) The suspension of all obligation to drill additional

wells, except offset wells, for a period of two years from date of the modification,

"(2) The modifying of the paragraph 9, by striking out 250 feet and inserting in lieu thereof, 330 feet, and in addition thereto, appropriate language to provide that when offset wells are being produced within said range, more or less, E. H. Moore Inc. likewise produce,

"(3) At the expiration of the two year period, E. H. Moore Inc. shall be obligated to drill three wells per year.

"The consideration for the above will be the paying of a minimum royalty of $25,000. per year, said royalty payable monthly in advance."

Regardless of who originated the form of language used in the "Supplemental Contract" it was Mr. Martin, acting for the plaintiff's predecessor, who finally drafted the contract; and it was the same Mr. Martin, acting in the same capacity, who was at all times the moving and pressing party in seeking a lease modification. Concerning Mr. Martin, and in the exercise of those fact finding prerogatives which are properly a function of the trial court, rather than of this court, the learned trial judge, in his memorandum opinion, says: "As the Court has intimated, it is inconceivable to it that E. H. Moore's Inc. able and experienced counsel would fail to provide, in plain and unambiguous terms, the present contentions of the plaintiff herein, *had* they been those now contended for." Certainly the quoted observation of the trial judge indicates not misconduct or error, as suggested by the majority opinion, but, rather, an entirely proper appreciation of the significance of circumstantial as well as direct evidence. And, in truth, the letter from Mr. Tognazzini to Mr. Martin, which Justice Traynor seizes upon as overwhelming substantially all other evidence in the record, is but a part—a greater part or a lesser part, as various fact finders might respectively view it—of a record which discloses with absolute certainty, to a reviewing court, only one thing: a substantial conflict in the evidence.

I have not herein, by any means, related every detail of evidence, either direct or circumstantial, which supports the trial court's findings and construction but what has been set forth above is ample, under any pertinent rules of law which ever heretofore have been followed in this state, not only to support, but to demand that we sustain, the lower court in its findings and conclusions.

For adequate treatment of those of the points briefed which I have not found it necessary or desirable to discuss in a dissenting opinion reference is made to the opinion prepared by Mr. Justice Wilson for the District Court of Appeal, Second Appellate District, Division Two, reported in 173 P.2d 700.

The judgment should be affirmed.

Shenk, J., and Carter, J., concurred.

Respondent's petition for a rehearing was denied February 9, 1948. Shenk, J., Carter, J., and Schauer, J., voted for a rehearing.