[Civ. No. 14818. First Dist., Div. One. Feb. 26, 1952.]

B. S. MacINTYRE, Respondent, v. PETER T. ANGEL et al., Appellants.

Philander Brooks Beadle and Morton L. Silvers for Appellants.

Franklin C. Stark, Raymond J. Salisbury and Stark & Champlin for Respondent.

WOOD (Fred B.), J.—Defendants appeal from a judgment rendered against them for $2,000 as the balance due plaintiff upon a written agreement and $4,050 as the balance due him upon an oral agreement for work done in the remodeling and decorating of a restaurant owned by the defendants as copartners. Not having discussed the $4,050 portion of the judgment, defendants may be deemed to have abandoned that phase of their appeal.

In respect to the $2,000 recovery upon the written agreement, appellants assign as error: (1) the admission of extrinsic evidence tending to show that the written agreement was not the joint and several obligation of respondent MacIntyre and one John Oshanna, an unlicensed person who also signed the agreement; and (2) the giving of a certain instruction whereby the trial court assertedly delegated to the jury the determination of a question of law, the question whether or not the written agreement imported a complete legal obligation.

(1) *The interpretation of the document, and the admissibility of extrinsic evidence in aid of its interpretation, became important* at the trial because if it were the joint and several obligation of respondent and Oshanna, respondent could not recover. Respondent held a state building contractor's license but Oshanna did not. Nor did they have a joint license

covering this venture. (See Bus. & Prof. Code, §§ 7028-7031, and *Loving & Evans* v. *Blick*, 33 Cal.2d 603 [204 P.2d 23].) Our inquiry starts with a reading of the document.

Dated June 9, 1947, written upon the letterhead of respondent MacIntyre, addressed to the ''Derby Restaurant,'' it reads as follows:

''Gentlemen:

''We agree to do the following installation and decoration in your Restaurant:

''EXTERIOR

''1. To remove the existing canopy over the entrance.

''2. To remodel the existing front of both the Restaurant and the cocktail room as shown on plan No. 2 . . . [Certain details thereof, and materials to be used, are specified.] . . .

''INTERIOR

''3. To build a checkroom and foyer as shown on plan. Walls of these two rooms to be 10 ft high . . . [Certain details thereof, described.] . . .

''4. To open the floor over the existing stairs leading down to the washrooms. To frame in a railing around the stairs from existing panels on the premises. All other work in repairing and plumbing below shall be figured later under separate agreement.

''5. To install double exit doors as shown on plan to conform with the requirements of the Fire Department.

''6. To install a maple hardwood dance floor on sleepers on the existing cement floor. Floor now to be approximately 1800 square ft. . . . [Platform for music, installation of mirrors, etc.] . . .

''All other construction such as moving the bar to new location, revamping the booths to fit along new locations and any other work will be figured aside from this agreement.

''DECORATION

''7. To drape the ceiling with panels of four pastel toned glass fibre cloth, plus full length wall drapes from the ceiling to the base of the band stand and as wide as the length of the band stand.

''8. To paint the walls and ceiling under the mezzanine in flat oil paint, and walls of the main room in the same

manner with color scheme to be mutually agreed on. The walls will be decorated in continental peasant type dance figures in a colorful, attractive manner.

"Electrical

"9. To install 14 light fixtures on the ceiling from the existing outlets. . . . [These are described; wiring and circuits specified.] . . .

"The above agreement does not include carpet or any plumbing.

"We will make every effort to complete this work within six weeks of signing of this agreement and start of work. This job will be subject to permits by the Dept. of Public Works and C.P.A. Authority.

"The above job will cost $15,500.00 and payable as follows:

$3000.00 on signing of this agreement and start of work.

$7000.00 payed [sic] progressively as the work continues to completion.

$3000.00 Two weeks after completion.

$2500.00 Thirty five days after completion.

[signed] JOHN OSHANNA
<hr>
John Oshanna, Designer-Decorator

"We accept the above agreement

[signed] B. S. MACINTYRE
<hr>
B. Stuart MacIntyre, Contractor

THE DERBY RESTAURANT

By, [signed] DR. P. ANGEL"

Appellants claim that this document clearly shows upon its face, without any ambiguity, that it is a single agreement, the joint and several obligation of MacIntyre and of Oshanna. They direct attention to the fact that it begins with the words "We agree to do the following installation and decoration in your Restaurant" and toward the end declares that "We will make every effort to complete this work within six weeks . . . ," emphasizing the "We"; was signed both by Oshanna and by MacIntyre, thus characterizing themselves as "We"; and lumps the construction work and the decorating work together, as one job, for a single price.

Respondent directs attention to the fact that respondent signed as "Contractor," but Oshanna signed as "Designer-Decorator." These words (coupled with the absence of a

designation, such as "first party" or other group term commonly used to indicate a joint undertaking by two or more persons), respondent says, are not mere *descriptio personae*; that these words are functional and indicate the kind of work respondent and Oshanna respectively and separately, not jointly, undertook to do; that these words are a part of the writing and provide the key to the portions of the work (constructional and decorative, separately described in the document) which respondent and Oshanna respectively and separately obligated themselves to perform; that, at the very least, there is an ambiguity which appears upon the face of the writing and is a part of it, one which requires the use of extrinsic evidence to ascertain the true intention of the parties signatory; and that such use of extrinsic evidence is for the purpose of interpreting the words used in the writing, not to vary the terms of the document.

Thus it appears that the parties are in disagreement as to the meaning of the writing which they signed, as was the case in *Wachs* v. *Wachs,* 11 Cal.2d 322, 325 [79 P.2d 1085], *Woodbine* v. *Van Horn,* 29 Cal.2d 95, 104 [173 P.2d 17], and *Union Oil Co.* v. *Union Sugar Co.,* 31 Cal.2d 300, 305 [188 P.2d 470]. As in each of those cases, the writing seems susceptible to either of the interpretations respectively urged by the parties. We cannot to a certainty and with sureness, by a mere reading of the document, determine which is the correct interpretation.

In such a situation, extrinsic evidence becomes admissible as an aid to interpretation, upon the principle, variously stated, as follows: "The fundamental canon of construction which is applicable to contracts generally is the ascertainment of the intention of the parties (Civ. Code, § 1636), and in accordance with section 1638 of the Civil Code, the language of the agreement, if clear and explicit and not conducive to an absurd result, must govern its interpretation. But this does not mean that a portion only of a written instrument, although it is clear and explicit, may be selected as furnishing conclusive evidence of the intentions of the parties. Section 1641 of the Civil Code embraces the true rule in providing that 'The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.' " (*Universal Sales Corp.* v. *California Etc. Mfg. Co.,* 20 Cal.2d 751, 760 [128 P.2d 665]); "A contract must receive such an interpretation as

will make it lawful, operative, definite, reasonable and capable of being carried into effect, if this can be done without violating the intention of the parties. (Civ. Code, §§ 1643, 3541; see Rest. Contracts, § 236(a).) When the language employed is fairly susceptible of either one of two constructions contended for, extrinsic evidence may be resorted to for the purpose of explaining the intention of the parties." (*Woodbine* v. *Van Horn, supra,* 29 Cal.2d 95, 104); "Once something has to be read into a contract to make it clear, it can hardly be said to be susceptible of only one interpretation. It would have been error for the trial court to read something into the contract by straining 'to find a clear meaning in an ambiguous document, and having done so exclude the extrinsic evidence on the ground that as so construed no ambiguity exists.' [Citation.]" (*Union Oil Co.* v. *Union Sugar Co., supra,* 31 Cal.2d 300, 306.)

Ours is not unlike the cases in which extrinsic evidence was admitted to determine whether or not an individual signed a "We promise to pay" note solely in a representative capacity, the signature being "Pioneer Mining Company, John E. Mason, Supt." (*Bean* v. *Pioneer Min. Co.,* 66 Cal. 451, 453 [6 P. 86]); or whether a person signed a contract in his individual as well as his representative capacity, when he signed as the president of a company and also as "stockholder" (*Lynch* v. *McDonald,* 155 Cal. 704 [102 P. 918]); or which type of agreement was intended when a person signed an "Owner Member" marketing agreement form but the designation "Renter Member" was written on the cover of the agreement (*California C. P. Growers* v. *Williams,* 11 Cal.2d 221, 228-229 [78 P.2d 1154]); or in what capacity a person signed when he wrote his name under his company's name, without prefixing any qualifying word such as "by" (*Carlesimo* v. *Schwebel,* 87 Cal.App.2d 482 [197 P.2d 167]).

 In such a case what are the aids to interpretation? We find them expressed in *Universal Sales Corp.* v. *California Etc. Mfg. Co., supra,* 20 Cal.2d 751 at 761: "As an aid in discovering the all-important element of intent of the parties to the contract, the trial court may look to the circumstances surrounding the making of the agreement [Citations], including the object, nature and subject matter of the writing [Citations], and the preliminary negotiations between the parties [Citations], and thus place itself in the same situation in which the parties found themselves at the time of contracting. [Citations.] Also applicable here is the familiar rule

that when a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court. [Citations.] The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention. [Citations.]'' (See, also, *Woodbine* v. *Van Horn*, *supra*, 29 Cal.2d 95, 104, and *Union Oil Co.* v. *Union Sugar Co.*, *supra*, 31 Cal.2d 300, 306.)

The trial judge properly admitted extrinsic evidence on this issue, and instructed the jury as to its use. That evidence supports the finding which is implied from the rendition of the verdict for respondent.

 It happened that before appellants interposed any objection upon the ground of varying the terms of the document,* respondent MacIntyre testified: In late April or May, 1947, I was contacted by Oshanna with respect to some renovation, decorating and construction work to be done at this restaurant; he introduced me to Dr. Angel (one of the appellants) and told him I was the contractor whom Oshanna had recommended to Angel; Angel then said he wanted to remodel the building there; they wanted to put on a new front, a new dance floor, decorate the ceiling, and some mural work on the walls; Dr. Angel said he would like an estimate of approximately what it would cost. He had had Oshanna prepare the preliminary drawing on the work; at this interview I was furnished with a copy of that drawing; Dr. Angel said Oshanna was going to do the designing and decorating work; Oshanna had already told Dr. Angel what his fee was, but I was to include it in my lump sum agreement, which I did; his fee was a little over $4,000. There were several papers typed by Oshanna in connection with this matter which were discussed between the three of us and then finally

---

*The failure to object did not of itself make such evidence available for interpretation of the agreement. The parol evidence rule is a rule of substantive law, not of evidence. (*Estate of Gaines*, 15 Cal.2d 255, 264-265 [100 P.2d 1055].) If extrinsic evidence is not properly admissible (as in the absence of an ambiguity in a writing), it must be ignored even though admitted without objection. (*Lifton* v. *Harshman*, 80 Cal. App.2d 422, 432 [182 P.2d 222].)

a paper was typed which was signed (the document under consideration). This document was typed by Oshanna. He is not a lawyer. I am not a lawyer, nor have I had any legal training. Oshanna prepared the plan mentioned in the agreement, and an architect prepared blue prints for the main and mezzanine floors. Oshanna painted his murals in the room there, work that Dr. Angel ordered him to do; the ceiling was draped with spun glass drapery; back of the bandstand it was draped with fireproof drapery materials. I paid Oshanna in full the amount he quoted at the outset as being his fee for doing the murals and design work. All of the amounts paid [by appellants] on this work were paid to me by checks made payable to my order in response to bills submitted by me, on my letterhead, addressed to appellants under the name "Derby Restaurant," each personally delivered by me to Dr. Angel. Those checks I cashed. In performing the written agreement I paid out $11,945.71 to subcontractors and for materials purchased, $646.47 for materials from my shop, and $1,143.63 to workmen employed by me.

Oshanna testified, without objection: My business is designing and painting murals, that is pictures; in late April or early May, 1947, I had a conversation with Dr. Angel in which he told me that he and his partners wanted the place dolled up; at first the thought was just as to decorating so he asked me to work out some designs and I said I would; I did, and brought them back to Dr. Angel; after I had the second plan he asked me if I knew a reliable contractor and on about the third trip I introduced MacIntyre to the doctor and the doctor asked and MacIntyre gave him an estimate after he had taken the blue prints home and studied them; I typed up the document which was signed; I typed that up for Mr. MacIntyre.

Oshanna was then asked if there had been any discussion prior to the time this document was signed with respect to what Oshanna was to do and what his fee was to be for doing it. Appellants objected upon the ground it would vary the terms of the written agreement. The objection was overruled. The witness answered that there had been a discussion with Dr. Angel, whereupon appellants asked that it be understood that their objection would go to all of this testimony, and the court so ruled. Thereupon Oshanna testified: I had a conversation with Dr. Angel before MacIntyre came in, at which time I told the doctor I would plan and design and there would be a percentage for supervision on the work, and so

much for murals; and I furnished and installed a lot of draperies; as to the fee, I preferred Angel to pay me directly and told him so and that it would be around $4,000, whereupon the doctor said he wanted it all bulked up on one bill, on one piece of paper with the contractor's fee; Angel said, "I want you to incorporate them right with the general contractor's, so they can pay that one amount, and he in turn can pay you." I told Dr. Angel it didn't make any difference, that all I was interested in was my design and the murals and I did not care who did the construction. MacIntyre paid me in connection with the work I did, the amount which I had quoted to Dr. Angel. I do not do contracting. I do murals. I mean, the designers and mural painters and artists are not required to have a license. I did not have a painter's or decorator's license, nor a contractor's license. I signed this document of June 9, 1947, and also put on my title, Designer and Decorator. I typed those words under my name, not as a contractor; I did that at the behest of Dr. Angel. He wanted to see that I supervised that work, according to his words. I had no joint bank account with respondent at any time. I let no sub-contracts, orally or in writing, on this work,— neither with the electrician, nor with the painter, nor with anyone else. I did not employ or pay the general painters. I bought the materials for the drapery, and had no men working for me except the drapery men I had to hang the material, and my assistant artists.

Appellants introduced evidence tending to show that this was a joint venture upon the part of respondent and Oshanna. That but produced a conflict in the evidence which it was the function of the jury to resolve. Dr. Angel did testify that no payments were made to Oshanna by the witness or any of the people connected with the Derby Restaurant, in connection with the work involved in this suit. Appellants stipulated that all of the money was paid to respondent.

It is apparent that the extrinsic evidence amply supports the implied finding of the jury that Dr. Angel instructed Oshanna to include his fee in the payment to be collected by MacIntyre and instructed MacIntyre to place the Oshanna contract in the document of June 9, 1947, and that the parties intended two separate contracts, one by appellants with Oshanna, the other by appellants with respondent.

Appellants, in their opening brief, directed attention to the fact that in one of the paragraphs of the first cause

of action in respondent's complaint, the statement was made that "there became due to plaintiff and Oshanna from the defendants . . . the total sum of $15,500.00 . . ." Oshanna is not mentioned elsewhere in the body of the complaint. Nor is he mentioned in the caption or the prayer of the complaint. It is not clear what or how much significance appellants attach to the quoted recital. Respondent replied that this recital at most created an uncertainty in the pleading, making it susceptible to special demurrer; that appellants failed to object to this uncertainty when their special demurrer was filed; that the objection comes too late upon appeal; also that appellants, upon the trial, brought this recital (as a statement of the respondent inconsistent with his testimony) to the attention of the jury, and the jury resolved the issue of fact in favor of respondent and against the appellants. We deem respondent's reply a complete answer to appellants' contention on this point.

Respondent urges that the extrinsic evidence was admissible for the additional reason that the "validity of the agreement" was "the fact in dispute," invoking subdivision 2 of section 1856 of the Code of Civil Procedure. We deem it unnecessary to consider this point in view of our conclusion that such evidence was admissible to resolve an ambiguity in the document.

*(2) By one of the instructions, appellants claim, the trial court delegated to the jury the determination of a question of law,* the question whether or not the written agreement imported a complete legal obligation. Appellants are mistaken. That instruction gave the jury questions of fact, not of law, to decide. The instruction read as follows: "If you find from all the evidence that the contract was intended by the parties to be one between the Derby Restaurant on one hand and Mr. MacIntyre alone on the other hand, and that Mr. Oshanna's relation to such parties was intended to be solely that of a— strike that last. If you find from all the evidence that it was not intended by the parties that the relationship should be a signed [single?] contract, but, rather, if you find that there were two separate contracts, one by the Derby Restaurant with Oshanna, and the other made by MacIntyre with the Derby Restaurant, and that the Derby Restaurant instructed MacIntyre to place the Oshanna contract in the memorandum of June 9, 1947, then the defense of illegality would not be good. That is to say, you have contradictory evidence here, which is your duty to resolve.

"As a matter of fact, you have testimony that the Derby Restaurant by and through Dr. Angel instructed Oshanna to include his fee in the payment to be collected by MacIntyre. You have contradictory evidence to that from Dr. Angel that he did not know the sum agreed on by Oshanna, and that he did not separately agree with Oshanna by denying work to be done. You will determine that contradiction under the rules that I have given you as to the credibility of witnesses, and as to the weight of evidence."

██ Appellants misconceive the clear import of this instruction. The court had already decided that the writing was ambiguous; that extrinsic evidence was admissible to resolve the ambiguity; and had admitted extrinsic evidence for that purpose. That evidence was conflicting. By this instruction, the judge told the jury how and where to proceed if they found this or that portion of the conflicting extrinsic evidence true. That was the submission to them of questions of fact.

As was said in *Walsh* v. *Walsh,* 18 Cal.2d 439, at 444 [116 P.2d 62]: " 'When the meaning of the language of a contract is uncertain or doubtful and parol evidence is introduced in aid of its interpretation, *the question of its meaning is one of fact . . .* ' " If the facts thus adduced were undisputed, it would be the function of the court, not the jury, to consider the writing in the light of such facts, but where (as in the instant case) those facts are in dispute (evidenced by testimony which is in conflict), " 'and the meaning of the contract is to be determined one way in one view of the facts, and another way in accordance with another view of the facts, then the determination of the disputed fact must be left to the jury.' " (*Coats* v. *General Motors Corp.,* 3 Cal.App.2d 340, 355 [39 P.2d 838].) The judgment should be affirmed.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied April 24, 1952.