119 Cal.App.2d 717 (1953)
MAX SCHMIDT, Appellant,
v.
MACCO CONSTRUCTION COMPANY (a Corporation) et al., Respondents.
California Court of Appeals. 
Aug. 17, 1953.
 James W. Harvey, Walter K. Olds and Dorothy E. Handy for Appellant.
 Delancey C. Smith for Respondents. *721
 PETERS, P. J.
 Plaintiff brought this action against the defendants for breach of a written contract under which defendants agreed to grade and fill a portion of plaintiff's land. The complaint prayed for $250,000 damages. The jury brought in a verdict of $17,500. The trial court denied a motion for entry of judgment notwithstanding the verdict. The defendants appealed from that order. The plaintiff moved to dismiss defendants' appeal, and also cross-appealed from the judgment. Subsequently, defendants abandoned their appeal, and, upon their request, it was dismissed. Thus, there is left for consideration only plaintiff's appeal from the judgment in his favor, it being his main contentions that the written contract was clear, definite and certain; that the trial court erroneously admitted parol evidence to explain some of the contract provisions; that this error in the admission of evidence resulted in plaintiff being awarded what he claims to be inadequate damages; and that the trial court erroneously instructed the jury in several respects.
 It is the theory of plaintiff that in awarding him but $17,500 the jury must have disregarded the terms of the written contract and must have based its verdict on the parol evidence claimed to have been erroneously admitted. Defendants urge that this is but an indirect manner of contending that damages are inadequate, and point out that plaintiff cannot urge inadequacy of damages because of his failure to urge said ground in a motion for a new trial. [1] It is the law that such a motion is a condition precedent to urging inadequacy of damages on appeal. (Alexander v. McDonald, 86 Cal.App.2d 670 [195 P.2d 24].) [2] But the rule that prevents plaintiff from now urging inadequacy of damages does not prevent him from urging errors in the admission of evidence and errors in the instructions, even though such errors, if they be errors, also resulted in an improper reduction of the damages. [3] A motion for a new trial is not, generally, a condition precedent to an appeal. [4] Generally speaking, any error of law can be raised on an appeal even though a motion for a new trial has not been made. [5] A plaintiff may appeal, of course, when he is awarded less than his demand. (Maxwell Hardware Co. v. Foster, 207 Cal. 167 [277 P. 327].) For these reasons, plaintiff is not precluded from urging the points relating to the claimed erroneous admission of evidence and the claimed erroneous instruction. *722
 We turn now to a consideration of the evidence, that most favorable to defendants being binding on this court. Plaintiff is a contractor and subdivider. Since early in 1946 he has owned a tract of undeveloped land located in San Mateo County in a hilly area near other developing subdivisions. The tract consists of two parcels described by the parties as units "A" and "B." Prior to 1946 the property was owned by the Colemans.
 The defendants, operating as joint adventurers, in 1944 entered into a contract with San Francisco, the state, United Air Lines and the Army to extend the existing runways at the San Francisco Airport. This contract required defendants to secure and deposit some 4,000,000 cubic yards of dry fill at the airport. In order to carry out this contract the defendants found it expedient, if not indispensable, to secure a right-of-way over the property then owned by the Colemans. The defendants, for a cash consideration not disclosed, secured from the Colemans a right-of-way over the land for the construction of a haul road and for the location of some of the piers for an overpass over the state highway. It was contemplated that the haul road would be constructed over the Coleman property for a distance of some 4 miles, and should be specially constructed for the use of 52-ton or heavier equipment which cannot lawfully travel on state highways. While the Colemans still owned the property, the overpass and the approaches to it had been constructed, requiring some cutting and filling. This overpass would be useless unless defendants could construct the haul road on the Coleman property, and from a practical standpoint such a haul road across the Coleman property was almost a necessity to defendants.
 When plaintiff purchased the Coleman tract defendants started negotiations to secure a right-of-way from him for the haul road. These negotiations took place over a period of some time and finally resulted in the execution of a written contract on May 25, 1946. The trial court, over objection, admitted evidence as to these prior negotiations. It is this evidence of the prior negotiations, and the evidence as to the prior arrangement with Coleman, that plaintiff contends was admitted in violation of the parol evidence rule.
 By the terms of the written contract the plaintiff leased to the defendants the property from June 2, 1946, to June 1, 1949. The contract refers to defendants' fill contracts, and to defendants' "agreements with the former owners of the *723 property ... for use of certain portions of such property and for right-of-way over portions of same," and granted to defendants the right to construct the designated right-of-way. A power line right-of-way was also granted.
 The source of the present controversy is to be found in the excavation provisions of the written contract, which provisions represent the consideration to be received by plaintiff for the lease. For purposes of description the entire property is referred to as the "Schmidt" land, and in describing what work was to be done the grading and filling work required is segregated between units "A" and "B." Admittedly, the parties knew exactly what they wanted done on parcel "A," which was a small parcel, and admittedly all the work that the contract required defendants to perform on "A" was in fact performed. The present controversy involves the nonperformance of work on parcel "B."
 The key paragraphs relating to the required grading to be done by defendants on both parcels read as follows:
 "2. In consideration of the foregoing Macco-MK agrees as follows:"
 "(a) Macco-MK will grade the land of Schmidt easterly of the proposed extension of Junipero Serra Boulevard to the El Camino Real in accordance with map prepared by James & Waters, Civil Engineers, dated April, 1946, to which map reference is hereby made and a copy of which is attached to this agreement and made a part hereof, without cost to Schmidt. The work to be done by Macco-MK pursuant to this clause of this paragraph is generally described as recontouring of the area in the northwesterly portion of the property; filling existing drainage ditches; and excavating proposed new drainage ditches shown on the map. The work to be done does not include any grubbing of the area but does include clearing smaller trees and brush but no clearing of trees with a diameter of more than eight (8) inches; any grading and/or paving of streets or roads, or any other street work of any kind; or the construction of any drainage structures shown, or located, or required by the map. The area described in this subparagraph (a) shall be known for purposes of this agreement as unit 'A,' and such work shall be commenced within sixteen (16) days after Schmidt has requested Macco-MK to proceed therewith, and shall be prosecuted with due diligence to completion within sixty (60) days. *724 "
 "(b) Macco-MK will also grade and fill without cost to Schmidt that portion of land of Schmidt west of the proposed Junipero Serra Boulevard and east of Skyline Boulevard within 1/2 foot of final grade to a useful contour for residential sites. A map showing approximate final contours will be furnished by Schmidt to Macco-MK within 45 days after the date hereof and this portion of the land of Schmidt shall be known as unit 'B.' The work to be done by Macco-MK is more particularly set forth in paragraph 2, subdivision (a) hereof, and said work to be done hereunder on Unit 'B' shall commence within fifteen (15) days after notice to Macco-MK from Schmidt, or in any event within ten (10) days after the completion of the grading provided to be done in unit 'A' as above set forth and will complete the work within seventy-five (75) days after commencing same."
 The prior negotiations, all admitted over objection, were to the following effect: Plaintiff was compelled to testify that he knew about the prior Coleman agreement. He was then asked about his conversations with Tucker, project manager of defendants, prior to the execution of the written contract. He testified that they discussed what was meant by "useful contour for residential sites"; that unit "B" was to correspond with unit "A" in having 50-foot lots with ditches filled and graded with dirt from "A"; that Tucker told him that he did not care how much earth was cut from "B" because defendants could use all of it as fill at the airport, and if the dirt could be secured from "B" it would save defendants 4 miles of hauling. Plaintiff denied that he then knew that the dirt from "B" was unacceptable as fill at the airport, and claimed that he did not learn that fact until six months after the contract was executed. His own counsel had him testify on redirect that he had told Tucker that he wanted "B" developed the same as "A," and wanted 50-foot residential lots on both parcels, and that Tucker had replied that the defendants would haul all the dirt desired from plaintiff's lands.
 Tucker admitted that, prior to the execution of the written contract, he and plaintiff had visited Millbrae Highlands, a neighboring developed subdivision, and that plaintiff had then stated that he wanted to develop his subdivision in a similar way. Tucker, over objection, was permitted to testify that plaintiff did not want a cash payment for the right-of-way because of income taxes, and that plaintiff, for this reason, refused a cash offer of $13,500 for a right-of-way for three *725 years, requesting instead an equivalent amount of grading, principally on "A," but with "some" on "B." Plaintiff wanted two drainage ditches filled on "A," the brush removed therefrom, a new ditch excavated, and a knoll recontoured. But plaintiff also wanted some additional consideration, and this resulted in further negotiations. These other demands were brought out by plaintiff on cross-examination of Tucker. Several suggestions were made by plaintiff, one of which was that defendants buy him an additional 500-foot strip of land to add to his present holdings. Then the parties discussed the possibility of defendants doing some grading on "B," but no specific agreement was reached as to the nature of this work until May 18, 1946, when a written memorandum, hereafter discussed, was executed. Tucker was positive that the parties definitely understood and agreed about the nature and the extent of the work to be done on "A."
 So far as using dirt from "B" as a fill at the airport is concerned, Tucker, on direct examination of defendants' counsel, contradicted plaintiff. Tucker stated that plaintiff had offered dirt from "B" for such purposes but that he had rejected it because it was not suitable under the airport specifications. Also on direct examination, and therefore subject to objection, Tucker testified that on May 18, 1946, he had a conversation with plaintiff; that plaintiff stated that he wanted to get the agreement settled; that he wanted the knoll on the top of the hill located on "B" removed, and the dirt placed in a canyon; that plaintiff stated he wanted to develop the whole area like Millbrae Highlands. The plaintiff had not then had a map prepared describing the finished subdivision as to "B," and the parties agreed that plaintiff should have such a map prepared and that 45 days was a reasonable period for such purposes. It was also agreed that no work on roads should be done by defendants, but defendants should remove the brush, leaving all trees over eight inches in diameter for plaintiff. At the conclusion of this conversation Tucker, in the presence of plaintiff, telephoned his superior in San Francisco and explained what plaintiff wanted. The superior asked him: "Are you sure you are not agreeing to do a lot more work than the $13,500?" When Tucker stated that he was sure of that fact, the superior officer authorized Tucker to close the deal.
 A written memorandum dealing only with "B" was then prepared, and this memo was used as a basis for the formal contract executed a week later. Tucker wrote out this memo *726 in longhand and plaintiff made various corrections to it. This memo, although first used in part by defendants for impeachment of plaintiff, was introduced into evidence by plaintiff upon his cross-examination of Tucker. The memo provided that defendants would "rough grade" to within a half foot of "a usable contour for residential sites." The word "rough" was omitted in the final contract and a provision for filling added. The memo provided that no grading for streets or house sites would be done. In the formal contract in clause "(a)" incorporated into "(b)" the provision as to house sites was omitted. There were other minor differences. The last clause of the memorandum was completely omitted from the final contract. It reads: "The above work is to be done in lieu of that proposed by Max Schmidt, wherein he required a 500 foot right-of-way on the north line of the property."
 After the written contract was executed defendants ultimately performed their obligations as to unit "A," during which work defendants handled between 70,000 and 75,000 cubic yards of dirt. As to unit "B," the contract provided that plaintiff within forty-five days was to furnish a map showing "approximate final contours." The plaintiff ultimately submitted three maps to defendants, and defendants submitted one to plaintiff, but the parties were unable to agree that any of such maps were in accordance with the agreement. As a result, the work on "B" was never performed, and this action resulted.
 The first map submitted by plaintiff as to unit "B" was the so-called F.H.A. map, a tentative subdivision map prepared by F.H.A. engineers. Plaintiff had this map as early as May, 1946, but although he told Tucker about it, he did not show it to him prior to the signing of the contract. Tucker stated that plaintiff had told him he would revise this map within the 45-day period. Plaintiff testified that this map, unrevised, was submitted to defendants no later than June 5, 1946, but Tucker testified that it was not submitted until at least two weeks or perhaps two months later. Plaintiff testified that Tucker told him the map was unacceptable because it called for too much work, and requested plaintiff to have prepared another map. While Tucker denied that he had said that the work called for by the F.H.A. map was too extensive, he admitted that such was the fact and that he had had that idea when he rejected it. He testified that he had rejected the map because it contained insufficient *727 data. No proposed contour lines were indicated, only existing contours being set forth. No data at all for grading was set forth. Defendants' expert Hutchison agreed with Tucker, and testified that the F.H.A. map was unusable without more engineering data. Plaintiff, while admitting that no proposed contour lines were shown, believed that an engineer could compute the yardage to be excavated.
 Plaintiff withdrew the F.H.A. map and later (August, 1946, according to plaintiff; November, 1946, according to Tucker) submitted the so-called Jones map, prepared for the Estes Engineering Company by Jones, a landscape engineer. Both plaintiff and Tucker agreed that Tucker rejected this map because it called for too much work, although there is some evidence that Tucker also stated then that any dirt removed from "B" could not be used at the airport. This map shows existing and proposed contours and proposed streets, and 90 per cent of unit "B" could have been usefully developed under it. This plan called for a general flattening out of the area and would require the moving of about 1,000,000 cubic yards of dirt. Tucker testified, over objection, that this was not in accord with the prior negotiations of the parties; that the Jones map called for moving forty times as much dirt as the parties had agreed was to be moved; that, among other things, it provided for a 75-foot cut never before discussed; that the parties in their prior negotiations had only talked about removing the knoll and for certain fill work; that the work contemplated would have required the handling of but about 20,000-25,000 cubic yards of soil. It will be remembered that the written contract provided that defendants were to perform the work on "B" within 75 days. Tucker testified that to move a million cubic feet of soil, as required by the Jones map, would take three million dollars of equipment and would take even then at least six months. All parties knew that such equipment was not then owned or available to defendants, and that most of defendants' equipment was tied up on the airport job. Tilley, one of plaintiff's experts, admitted that "B" could not be economically graded under the Jones map.
 The Jones map was withdrawn, and on January 21, 1947, the so-called Deutsch map was delivered by plaintiff to Tucker, and an addition to it was delivered February 8, 1947. According to plaintiff, Tucker took one look at the map and rejected it as calling for too much work, and stated that defendants would prepare a map. Tucker testified that he had defendants' *728 engineers study the map for a week, and then told plaintiff that the map called for too much work because, among other things, it called for 700,000 cubic yards of fill that would have to be imported. According to Tucker, when he told plaintiff that the map was unacceptable, and that defendants' engineers would prepare a map, plaintiff told him to go ahead because he had failed in his attempts to present an acceptable map.
 Defendants thereafter prepared the so-called Hutchison map and presented it to plaintiff in August or September of 1947. After a week's study, plaintiff told Tucker that his engineers were of the opinion that the plan set forth in this map was unworkable. Plaintiff's objections were mainly predicated upon the fact that some of the proposed building lots had banks of twenty or thirty or more feet along the proposed roads, so that plaintiff felt they were not usable for development of small residential sites. Plaintiff testified that when he voiced these objections to Tucker, the latter told him to take it or leave it, and the negotiations ended. This conduct was relied upon by plaintiff at the trial as a repudiation, and the jury apparently so found, also impliedly finding, pursuant to proper instructions, that there had been a waiver of the map provision contained in the contract.
 Plaintiff's only objection to the Hutchison map was that it did not provide for useful contours for residential sites because the banks by the proposed streets would be too high. His experts corroborated him.
 Tucker testified that the Hutchison map called for 27,000 cubic yards of cut and 38,000 cubic yards of fill. He admitted that the plan did not call for any cutting upon the roadway sites, claiming that such cutting should be done by plaintiff. Hutchison testified that his map was based on a study of the entire area in order to correlate the street layout with the adjoining development. He testified that his map called for general levelling off the area by grading the knoll and filling two adjacent ravines, which would require 40,000 cubic yards of excavation. At least one of plaintiff's experts believed that unit "B" was not suitable for mass subdivision purposes, but others believed it could have been developed as was "A." Defendants' experts believed that to develop "B" like "A" would be entirely too expensive, and that "B" could only be used for "hand tailored building sites."
 Plaintiff attempted to prove his damages caused by the claimed breach of contract in two different ways, one by *729 showing or attempting to show loss of improved value, and the other by evidence of the cost of doing the work. It should be mentioned that the court and jury, with consent of both litigants, viewed the property in question.
 The testimony as to loss of improved value was at best fragmentary and apparently not believed by the jury. But the evidence as to the cost of doing the work was more complete. One Robert Tilley presented a map, admitted only to show damages, which he claimed set forth a proper and economical development of the property into 180 building lots, and which also showed the proposed road work. This witness admitted, however, that he could not give an estimate of the cost of doing the work called for by his plan without further study. Fred Sperry, an excavating contractor, did give some mathematical evidence as to the cost to plaintiff of doing the work. While he admitted that there was no going rate generally for doing excavation work, because of the varying factors involved, he did testify that at the time of trial (October of 1951) the cost would be 50 cents a cubic yard, and that in 1947 it would have cost between 40 and 43 cents per cubic yard. This last was testified to by him as being a "rough estimate."
 Lee Hamm, another expert, refused to fix a definite price for excavation, but did testify that 1947 grading costs were 25 per cent to 30 per cent lower than those existing in 1951.
 Plaintiff offered, and the trial court gave, an instruction on damages based upon the cost theory. We have no way of knowing how the jury arrived at its verdict of $17,500. Apparently, it believed that the parties had agreed that defendants would excavate from unit "B" about 40,000 cubic yards of soil. If Sperry's figure of 43 cents per cubic yard was accepted, this would make a cost of $17,200. The cost for maps, etc., would easily raise that to $17,500. This probably was the theory of the jury.
 The basic contention of plaintiff is that the trial court erroneously and prejudicially admitted parol evidence relating to the prior Coleman contract, and relating to the negotiations leading up to the execution of the written contract of May 25, 1946. The contention is that since the contract was ultimately reduced to writing, it superseded all prior negotiations and circumstances. It is then contended that the written contract is clear and explicit on its face, and that the parol evidence varied the terms of the written contract. Based on these premises, the conclusion necessarily follows *730 that the parol evidence should not, over objection, have been admitted.
 The basic premise of this argument is unsound. [6] It is of course the law that a written contract containing the entire agreement of the parties supersedes all prior and contemporaneous negotiations. (Estate of Gaines, 15 Cal.2d 255 [100 P.2d 1055]; United Iron Works v. Outer Harbor D. & W. Co., 168 Cal. 81 [141 P. 917]; Parker v. Meneley, 106 Cal.App.2d 391 [235 P.2d 101].) [7] But those cases, and many more that could be cited, all recognize that if the contract is uncertain or ambiguous, parol evidence is admissible to show what the parties meant by the uncertain or ambiguous word or phrase used in the written contract.
 In the instant case the controversy hinges upon the operative phrase of the written contract providing that defendants were required to "grade and fill ... within 1/2 foot of final grade to a useful contour for residential sites." Is that phrase so clear, explicit and certain that it was error to admit extrinsic evidence to explain it? The parol evidence produced by the defendants was to the effect that they were to excavate about 40,000 cubic yards of soil. Plaintiff urges that this evidence completely disregards and is contrary to the "useful contour" provision of the contract.
 [8] At the inception of this argument over the admission of this parol evidence plaintiff argues, correctly, that before parol evidence is admissible the trial court must determine, as a question of law, that the contract is ambiguous or uncertain. (Universal Sales Corp. v. California Press Mfg. Co., 20 Cal.2d 751 [128 P.2d 665]; Brant v. California Dairies, Inc., 4 Cal.2d 128 [48 P.2d 13]; Sass v. Hank, 108 Cal.App.2d 207, 208 [238 P.2d 652].) Plaintiff then complains that the trial court, before admitting this evidence, did not expressly rule that the contract was ambiguous. [9] The complete answer to this argument is that the law does not provide how the trial court shall make the required determination of ambiguity. The plaintiff was contending that the contract was clear and certain. The defendants contended that it was not. Defendants offered extrinsic evidence of the meaning of the contested phrase on the theory that it needed explanation. When the trial court, over objection, ruled that the evidence was admissible it necessarily ruled that the contract was ambiguous. That is the only form of determination of that issue that need be made.
 On the main issue as to whether the contract is clear and *731 certain it is quite obvious that it is not. Without the map that the contract provided plaintiff should later produce (a requirement that the jury found had apparently been waived), it is impossible to determine with certainty and sureness without extrinsic evidence what portions of unit "B" should be graded or filled, or what the parties meant by the ambiguous phrase "useful contour for residential sites." [10] By a mere reading of the contract the court could not determine, nor could an engineer say, just what work was required of defendants on unit "B." This being so, the extrinsic evidence was admissible not to vary the terms of the written contract but to ascertain what the parties really intended by its ambiguous provisions.
 [11] The rules applicable to this problem were recently summarized by Mr. Justice Bray, speaking for this court, in the case of Bartel v. Associated Dental Supply Co., 114 Cal.App.2d 750 [251 P.2d 16]. At page 752 he stated: "Generally, the rule is that 'If the language of the instrument is clear and explicit the intention of the parties must be ascertained from the writing alone,' and 'Parol evidence is admissible only where the language used is doubtful, uncertain or ambiguous and only then in cases where the doubt appears upon the face of the contract.' (Eastern-Columbia, Inc. v. System Auto Parks, Inc., 100 Cal.App.2d 541, 545 [224 P.2d 37].) [12] Unless a court can 'to a certainty and with sureness, by a mere reading of the document, determine which is the correct interpretation ... extrinsic evidence becomes admissible as an aid to interpretation. ...' (MacIntyre v. Angel, 109 Cal.App.2d 425, 429 [240 P.2d 1047].)"
 [13] At page 753 the summary continues as follows: "As well said by Mr. Justice Dooling in Body-Steffner Co. v. Flotill Products, Inc., 63 Cal.App.2d 555, 561-562 [147 P.2d 84], '... where extrinsic evidence is offered to explain inconsistent provisions in a contract courts should not strain to find a clear meaning in an ambiguous document, and having done so exclude the extrinsic evidence on the ground that as so construed no ambiguity exists. ...' Mr. Presiding Justice Peters said in Wells v. Wells, 74 Cal.App.2d 449 [169 P.2d 23]: 'Much can be said in support of the rule that parol evidence is not only admissible to explain an ambiguity appearing on the face of the document but is also admissible to show that what appears to be a perfectly clear agreement, in fact meant something entirely different to the parties.' (See, also, Jegen v. Berger, 77 Cal.App.2d 1, 7 [174 P.2d 489].) *732 "
 [14] "In Barham v. Barham, 33 Cal.2d 416 [202 P.2d 289], Mr. Justice Spence succinctly sums up the rules concerning the interpretation of agreements (pp. 422-423): 'When the language used is fairly susceptible to one of two constructions, extrinsic evidence may be considered, not to vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties [citation], not to show that "the parties meant something other than what they said" but to show "what they meant by what they said" [citation]. [15] Where any doubt exists as to the purport of the parties' dealings as expressed in the wording of their contract, the court may look to the circumstances surrounding its execution--including the object, nature and subject matter of the agreement [citation]--as well as to subsequent acts or declarations of the parties "shedding light upon the question of their mutual intention at the time of contracting" [citation]. [16] To this latter point, it is said that "a construction given the contract by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight and will, when reasonable, be adopted and enforced by the court." [Citations.]' " (See, also, Decter v. Stevenson Properties, Inc., 39 Cal.2d 407 [247 P.2d 11]; Union Oil Co. v. Union Sugar Co., 31 Cal.2d 300 [188 P.2d 470].)
 Under these rules extrinsic evidence was clearly admissible to explain the contract. We turn now to a consideration of plaintiff's specific assignments of error. It must be determined whether the evidence objected to and admitted was directed to an interpretation of the challenged clause.
 [17] Plaintiff first objects to all of the evidence relating to the prior contract between defendants and Coleman. The only testimony admitted merely mentioned the existence of the agreement and the location of the right-of-way granted. The amount of consideration given by defendants to Coleman was, on objection, excluded. Why plaintiff objects to this evidence is not clear. The written contract itself recited the existence of the prior Coleman agreement, and the Coleman contract was in fact read to the jury by plaintiff's counsel. The location of the right-of-way was an immaterial factor, and even if erroneously admitted, could not possibly have been prejudicial. The fact that "a" consideration had been paid to the Colemans, without specification of amount, merely confirmed what the jury would have obviously inferred--e.g., that defendants had paid the Colemans a consideration for *733 the agreement. There was no prejudicial error committed in the admission of this testimony.
 Plaintiff next complains of the admission of all of the testimony relating to the preliminary negotiations between plaintiff and Tucker. Besides objecting to much specific testimony that even if erroneously admitted could not possibly have been prejudicial, plaintiff does list several items of testimony which, if erroneously admitted, would clearly have been prejudicial. Thus, Tucker was permitted to testify, or plaintiff was compelled to testify, that plaintiff did not want the $13,500 cash consideration proffered to him because of income tax problems; that plaintiff wanted an "equivalent" amount of grading on "B" as was provided for "A"; that plaintiff did not feel that the work on "A" was sufficient consideration and wanted "some" work on "B"; that plaintiff suggested that the knoll on "B" be removed and the dirt placed in an adjacent ravine; that in the conversation with plaintiff just before the written memorandum was prepared, Tucker called his superior who asked him if he was sure that he was not agreeing to do more excavation than would be covered by $13,500; that the Jones map was not in accord with prior negotiations, called for more work than had been agreed upon, forty times as much excavation, and a new 75-foot cut, etc.
 [18] It is obvious that in the absence of the map, all of this evidence was pertinent and relevant as to what the parties meant by grading "within 1/2 foot of final grade to a useful contour for residential sites." If the parties had agreed that this meant the removal of about 40,000 cubic yards of material, obviously the contract did not require the removal of a million cubic yards of material. All of this evidence was reasonably relevant to interpreting the challenged clause. Aside from the fact that plaintiff on direct examination of his witnesses or on cross-examination of the witnesses for defendants introduced some material evidence on these matters, all of the challenged evidence was admissible for the reasons already stated.
 Plaintiff next attacks the instructions. His basic contention, aside from attacks on specific instructions, is that the court erroneously instructed that the construction of the written contract was one of fact and not of law. This contention is merely another way of stating that the written contract was clear and certain, and that its interpretation should be based on the written contract and not on the parol *734 evidence. [19] Of course, the interpretation of a written contract, where parol evidence is not or cannot be admitted, becomes a question of law (Code Civ. Proc., 2102; Estate of Platt, 21 Cal.2d 343 [131 P.2d 825]), but when, as here, parol evidence is properly admissible, and such evidence is conflicting, the question of interpretation becomes one of fact and not of law. (Estate of Rule, 25 Cal.2d 1 [152 P.2d 1003, 155 A.L.R. 1319]; Universal Sales Corp. v. California Press Mfg. Co., 20 Cal.2d 751 [128 P.2d 665]; Crillo v. Curtola, 91 Cal.App.2d 263 [204 P.2d 941]; Overton v. Vita-Food Corp., 94 Cal.App.2d 367 [210 P.2d 757].)
 The plaintiff properly contends that the trial court did not point out to the jury what clauses of the contract were clear and what were ambiguous, and contends that this should have been done. [20] It is true that, in a case involving several clauses of a contract, some clear and some ambiguous, the interpretation of the unambiguous clauses is one of law and only the interpretation of the ambiguous clauses is one of fact, and that the jury should be so instructed, but the failure to so instruct in the instant case was not prejudicial. Here, as the case was tried, it was obvious that, so far as the interpretation of the contract was concerned, the only controversy involved the "useful contour" clause. That was the clause defining defendants' duties. [21] When the trial court properly admitted parol evidence to explain that clause, and thus ruled that the clause was ambiguous, the interpretation of that clause became one of fact for the jury and not a question of law for the court. [22] While the instructions should have explicitly stated that only this ambiguous clause should be interpreted by the jury, since the case was tried on the theory that this was the basic clause in dispute, the failure to do so could not possibly have adversely affected plaintiff. Moreover, plaintiff's trial counsel offered no instructions to define the extent of the ambiguity or to limit the jury's powers on this subject. In the absence of an offer of proper instructions plaintiff is in no legal position to complain. (Viera v. Gordon, 113 Cal.App.2d 700 [248 P.2d 981].)
 The court did use some unfortunate language in one of the preliminary instructions on this subject. After first properly stating that the court expressed no opinion on what facts were proved or not proved the court also stated that it expressed no opinion "as to what the materiality of the facts are." The use of the word "materiality" was unfortunate. *735
 [23] Obviously, the court should admit no evidence that is not material. By admitting it, over objection, the court necessarily determined that it was material. What the court was attempting to say was that it was not determining that such evidence was or was not decisive on the issue of interpretation. [24] But the improper use of the term could not possibly have misled the jury or prejudiced the plaintiff. When read in context, and with the other instructions given, the instruction, to a reasonable mind, could only mean that the court was expressing no opinion as to the facts.
 [25] It should also be pointed out that many of the challenged instructions (which need not be discussed in detail) were given by the court of its own motion, but that plaintiff offered similar instructions which were refused because they were already covered by the instructions given on the court's own motion. As to these instructions, even if erroneous, the doctrine of invited error applies. (Blythe v. City & County of San Francisco, 83 Cal.App.2d 125 [188 P.2d 40]; Connor v. Pacific Greyhound Lines, 104 Cal.App.2d 746 [232 P.2d 500]; see cases collected 4 Cal.Jur.2d p. 422, 557.)
 [26] There was one instruction that should not have been given. It reads: "When, through mistake or accident, a written contract fails to express the real intention of the parties, such real intention is to be regarded, and the erroneous parts of the writing disregarded." The instruction, while it somewhat awkwardly expresses a correct abstract principle of law, should not have been given because there was no evidence of "mistake or accident." Defendants, on the oral argument, conceded that the instruction should not have been given for that reason. [27] While it has been held, under some circumstances, that even a correct instruction on an abstract question of law not involved in a case may be prejudicial because it may have misled the jury, that is not so in the present case. The other instructions as a whole clearly and without substantial ambiguity told the jury what the issues before the jury were. The jury could not possibly have believed that the issues of accident or mistake as to the terms of the written contract were before them.
 [28] One of the instructions told the jury that the intention of the parties to a written contract must be ascertained "from the writing alone, if possible," subject to other rules of interpretation later to be given, and another read that the language of the contract governs "if the language is clear and explicit, and does not involve an absurdity." Plaintiff *736 interprets these instructions as permitting the jury, in ascertaining the intent of the parties, to disregard completely the words of the contract if it was not "possible" to ascertain it from the contract alone, or if the contract words were not "clear and explicit." While these instructions were not happily worded, it is clear that plaintiff's construction is strained and unnatural. The court was telling the jury to interpret intention "if possible" from the contract alone, if the terms were "clear and explicit," and to resort to the parol evidence only if it found to the contrary. If parol evidence were considered it was to be used to interpret the words of the contract, as the later instructions clearly stated. The jury, at least three times, was told that the writing was the primary guide to interpretation, and that the extrinsic evidence was admitted as a guide to interpreting that writing. We find no prejudicial error in the instructions given or refused.
 It should be pointed out that, once it is determined that the trial court properly admitted the parol evidence of the prior negotiations for the purpose of interpreting the "useful contour" clause, none of the minor errors here shown to exist could possibly have been prejudicial. This is so because, although the evidence is conflicting, the great weight of the evidence (and the jury apparently so found) is to the effect that the parties contemplated that only the knoll on "B" should be removed and the ravine filled requiring the excavation of a limited amount of material, that is, about 40,000 cubic yards. Plaintiff wants damages for the failure to remove a million cubic yards. The parol evidence shows that this was never intended. The parties had in mind an amount of excavation that would cost or be worth about $13,500. Plaintiff has secured a judgment for $17,500. This amount, the jury could well have found, was in excess of the amount of work contemplated by the parties. The defendants, having no appeal pending, cannot and do not claim the judgment is excessive. But these facts are quite relevant in determining whether the minor errors in the instructions were prejudicial. It is obvious that they were not.
 The judgment appealed from is affirmed.
 Bray, J., and Wood (Fred B.), J., concurred.