[Civ. No. 4936.   Fourth Dist.   July 5, 1955.]

WILLIAM E. CRAWFORD, Respondent, v. HUB RANCH OF PARADISE VALLEY (a Partnership) et al., Appellants.

Iener W. Nielsen, Mikio Uchiyama, Harold V. Thompson, Kimble, Thomas, Snell, Jamison & Russell, Wild, Carlson & Reeve, Wild, Christensen, Barnard & Wild and Robert M. Barnard for Appellants.

H. A. Savage and Stutsman, Hackett & Nagel for Respondent.

MUSSELL, J.—This is an action for damages for breach of a lease agreement entered into on August 12, 1949, by and between plaintiff, William E. Crawford, and James DeLucas, as lessees, and Hub Ranch of Paradise Valley, a partnership, composed of Shigeru Uchiyama, C. E. Halliburton and R. R. Bray, the general partners, as lessor. A cross-complaint was filed against Crawford to recover a loan in the sum of $2,500 made to him by Halliburton and Uchiyama. Halliburton died before the trial of the action and Eva M. Halliburton, as executrix of his estate, was substituted, and said executrix filed an amended answer. A jury trial was had, resulting in a verdict for plaintiff and against defendants for the sum of $134,640, and in favor of the cross-complainants on their cross-complaint for the sum of $2,500. Defendants appeal from the judgment against them and defendant Eva Halliburton, as executrix, also appeals from the order denying the motion for judgment notwithstanding the verdict.

The defendant Hub Ranch, a limited partnership, early in 1949 purchased approximately 41,400 acres of land in Humboldt County, Nevada, and 12 sections thereof are involved in this action. The said 12 sections were undeveloped and required clearing, leveling and developing of a water supply from underground sources before they could be farmed. R. R. Bray was the general manager of the Hub Ranch and was authorized to enter into partnership transactions and contracts not exceeding the sum of $1,000.

In May, 1949, plaintiff and James DeLucas visited the property, contacted Mr. Bray, and discussed with him the leasing of 12 sections of the ranch property. Bray informed them that he was general manager and that their primary negotiations would be with him, subject to the approval of the other partners. Crawford stated that they did not have the money to "go ahead and" complete a development the "size potentially had there" and asked Bray whether or not it would be possible "to do some outside financing." Bray then stated

that there was a financing setup already established through an insurance company whereby it agreed to advance so much money on land as it was developed. Bray further stated that Mr. Herman, who represented the insurance company, had visited the land and would advance $10,000 a section at such time as the land was leveled and water was brought to the surface. Several weeks prior to the date of the lease here involved Bray and Crawford, at Bray's suggestion, went to Los Angeles to discuss the insurance loan with Mr. Herman. Crawford testified in this connection that one purpose of this discussion with Mr. Herman was to verify the insurance loan and "also to have the loan made out to me, with the land being put up as security"; that Herman asked him if he had enough money to carry out the development, to level the first section, and Crawford stated that he had with the exception of the well; that he, Crawford, stated he would level the section and put a well on it if the insurance company would grant $10,000 upon completion; that Herman said "Yes," he says, "The minute the land is level and the water is on top of the ground." He says, "You 'phone me long distance down here, and I'll come up there." He says, "You'll have a check in less than 30 days"; that Herman stated that he had already approved the loan of $10,000 per section and that "It was only necessary to change the application over into my name, and then send it back to the home office. And he said the home office rarely, if ever, turned down a loan once he had okayed it out here on the west coast."

Early in August, 1949, Crawford went to Fresno for the purpose of negotiating a lease with the Hub Ranch for 12 sections of land. Bray and Crawford went to the office of Mr. Hollins, an attorney, and the lease was prepared by him. This draft was signed by Bray, Crawford and DeLucas. It was then submitted to the remaining general partners of the Hub Ranch and a conference was held at the office of Mr. Snell, one of the attorneys for the defendants. The Hollins draft of the lease was not acceptable to the remaining partners of the Hub Ranch particularly by reason of the fact that it contained no reference to existing encumbrances on the property or the payment of the indebtedness then secured by a mortgage on the premises.

The lease here involved was then drawn up and executed by the Hub Ranch, Crawford and DeLucas. It provided generally as follows: Twelve sections of land were leased to

plaintiff and James DeLucas for a period of five years, with an option to renew for an additional five years. The 12 sections were to be adjoining and were to be selected by the lessees within 60 days. The lessees were to clear and level said land, install wells, equipment and ditches for irrigation or drainage, one section the first year, two sections each and every year thereafter until all of said land had been developed as therein provided. The lessees agreed to devote all of the leased premises to the raising of grains or other suitable crops and as return for the said leased premises the lessor was to receive one-fifth of the entire crop of grain and other crops raised on the premises, except as to vegetables, of which it was to receive one-sixth. The lease also contained an option to purchase one or more sections of said land at $50 an acre, provided that one-half of the rent lessor received was to apply on the purchase price of the land upon which lessees exercised the option to purchase. The lease also contained a covenant against assignments without the written consent of the lessor, and contained the following two paragraphs:

''8. It is understood that the Lessees contemplate borrowing money for the purpose of clearing, leveling, irrigating, draining and water development, including wells, pumps and pipelines, and Lessor agrees to execute the necessary loan documents to consummate the borrowing of moneys to complete the foregoing development.

''21. Lessor agrees that two-thirds of all payments received under this contract will be applied to the discharge of any indebtedness now secured by mortgage on any portion of the demised premises. Lessor shall not, except with consent of Lessees, borrow money upon the security of the demised premises unless the money so borrowed is expended in improvement of the demised premises.''

It is the contention of the plaintiff that said paragraph 8 required the leased premises to be free and clear of all encumbrances to enable lessees to borrow money to develop the land and it is the contention of the defendants that the language of paragraph 8 was clear and unambiguous and merely required the lessor to subordinate its interest in the leased premises to any loan which the lessees might secure for the development of the property. Defendants further contend that said paragraph 21 clearly disclosed the existence of the then existing encumbrance on the property, to which encumbrance they agreed to apply two-thirds of the lease rentals in repayment.

It is undisputed that at the time of the execution of the lease there was a then existing deed of trust on the property, which is referred to throughout the trial as the Cordoza deed of trust, in the amount of $26,666.67. This deed of trust covered one of the sections plaintiff chose to develop first, namely, section 21.

The lessees moved their equipment upon the property in August and September, 1949, and commenced the development of section 21 and a portion of section 20. This development consisted chiefly of clearing off the sage brush, discing and land planing. The lessees then proceeded with the drilling of a well and entered into a contract with one R. L. Norris to drill it on section 21. The contract was executed on September 28, 1949. The well was completed by Mr. Norris, the driller, on or about October 30, 1949, and a pump installed. The well would pump 2,500 gallons per minute and was adequate to irrigate section 21 if it were properly prepared.

DeLucas testified that some time after the middle of August, 1949, he went up to the property and Crawford was then engaged in tearing down a fence; that he assisted Crawford until their equipment "was finally in tact up there"; that they proceeded to clear all of section 21 and part of section 20; that they burned the brush, disced and land planed; that it was in the latter part of September, 1949, that they had finished the grading and leveling of section 21 and that they then did some work on section 20.

In November, 1949, James DeLucas assigned in writing his interest in the lease to plaintiff William E. Crawford.

Crawford testified that some time in March, 1950, he planted section 21 to barley and planted 92 acres of wheat on section 20; that by May 5, 1950, the grain was 2 or 3 inches out of the ground; that he secured the loan of a pump early in May but was unable to irrigate any appreciable portion of his land and the crop failed. He further testified that shortly before September 21, 1949, he discovered for the first time that section 21 was subject to the Cordoza trust deed in the sum of $26,666.67; that on September 21, 1949, he turned the lease over to H. A. Parichan, an attorney, who on that date wrote a letter to the Hub Ranch advising them that they had failed to comply with paragraph 8 of the lease and that he hoped it would not be necessary to enforce the agreement. On September 27, 1949, Crawford and DeLucas wrote to Mr. Halliburton stating, in effect, that they had employed Mr.

Parichan to expedite the removal of the first trust deed on the property; that they could not wait "after the completion" of their work, and that everything must be in order so that they could collect the insurance company loan immediately.

A meeting of the Hub Ranch partners was held November 3, 1949, to discuss the removal of the Cordoza trust deed. At this meeting DeLucas told the group that they had reached "the end of their rope" and had to have the insurance loan in order to install a pump and start irrigating. While the partners did not admit they were under obligation to lift the Cordoza trust deed, they instructed their attorney, Mr. Snell, to prepare an agreement to see if that could be accomplished. On or about November 26, 1949, a number of persons, including Halliburton and Uchiyama, entered into an agreement as joint venturers to acquire the Cordoza trust deed and agreed to contribute the sum set opposite their respective names in said agreement. In pursuance of this agreement the Cordoza note and trust deed was, on November 30, 1949, assigned to one Oscar Crain as trustee for the joint contributors.

On March 10, 1950, Mr. Leighton, attorney for Mr. Norris, wrote to Mr. Snell enclosing a statement rendered by Norris to Crawford and stating that in addition to the amount shown therein Norris had agreed to furnish and install a pump which would complete the work on the well and have it ready for pumping; that the amount shown on the statement, plus the cost of the pump and its installation, was the basis of the amount which must be financed and was shown on the note enclosed to be scoured by a deed of trust on section 21, to be executed for the benefit of Mr. Norris. It was further stated therein that Norris would enforce a lien on the land unless security was given him. Snell replied to this letter stating that section 21 was then subject to a trust deed and further stated, in effect, that he was unable to comply with the request of Mr. Norris.

It is evident from the voluminous record before us and the statements in respondent's brief that his principal contention is that the defendants breached the lease and caused his damages by failing to secure the release of the Cordoza deed of trust, and by refusing to execute a trust deed to Mr. Norris on section 21 for the cost of the well. However, paragraph 21 of the lease provided that two-thirds of all payments received under the contract would be applied to the discharge of any indebtedness then secured by mortgage on

any portion of the property. The evidence shows without contradiction that this paragraph was not in the original draft of the lease prepared by Mr. Hollins and that it was added to the lease at the insistence of defendants. There was then only one encumbrance on the property of the Hub Ranch and that was the Cordoza trust deed. The defendants were unable to execute the lease without providing for its payment as set forth in said paragraph 21. Crawford knew that there was an encumbrance on the property and so testified. He claimed that he did not know section 21 was subject to a trust deed until some time in September, 1949. However, when he signed the lease he had not made his selection of the sections to be leased and could easily have selected an unencumbered section for his first development and could have ascertained the fact that the trust deed covered section 21. Under the terms of the lease defendants were not required to remove the Cordoza trust deed except as provided in paragraph 21 of the lease.

The trial court ruled that parol evidence was admissible to aid in interpreting paragraphs 8 and 21 of the lease and this rule is supported by the holding in *Schmidt* v. *Macco Const. Co.*, 119 Cal.App.2d 717, 730, 731 [260 P.2d 230], where the court held that if a contract is uncertain or ambiguous, parol evidence is admissible to show what the parties meant by the uncertain or ambiguous phrase used in the written contract; that if the language of the instrument is clear and explicit, the intention of the parties must be ascertained from the writing alone, and parol evidence is admissible only when the language used is doubtful, uncertain or ambiguous and only then in cases where doubt appears on the face of the contract; that unless a court can to a certainty and with sureness, by a mere reading of the document, determine which is the correct interpretation, extrinsic evidence becomes admissible as an aid to its interpretation.

According to the testimony of DeLucas the interpretation placed upon the lease by him was as follows: ''The lease was contingent on the moneys being available to us from the insurance company''; that he and Crawford were to borrow the money and that ''My understanding was that the moneys would be available to us from the life insurance, or this insurance company, and that the lessors were willing to hypothecate their land to allow us to borrow the money. That was my understanding of it.'' Plaintiff Crawford testified in this connection that before the lease was executed there

was a discussion in Mr. Snell's office between the general partners, in his presence, and that "During the conversation a discussion was had by all present that there were certain encumbrances on the property of the Hub Ranch. . . . Also that certain portions of the land were not completely owned by the Hub Ranch." He testified further that he could not secure financing; that "The insurance company, that was the understanding when we made the deal with them, that Hub put up the land as security." It is apparent that Crawford and DeLucas were relying on the consummation of a loan with the insurance company to finance the development of the leased property and not on any loan or loans to be obtained by the Hub Ranch. Crawford was informed by Bray that the Hub Ranch had made an application for a loan from the insurance company in the sum of $60,000 and he was clearly relying on the insurance company to make the loan to him. He discussed the loan with Mr. Herman and testified that Herman told him he would deliver a check to him within 30 days after water was "on top of the ground." However, he admitted that Herman told him it was necessary that the application be changed to his (Crawford's) name and sent back to the home office of the insurance company for approval. There is nothing in the record to indicate that Hub Ranch refused to execute any loan document in connection with this loan. Herman testified that he told Crawford that the loans had to be approved by the home office by the loan committee and it would take 10 days or two weeks after the application was submitted with his recommendation. He testified that he had not stated to Crawford that he would give him a check within 30 days after water was "on top of the ground" and the land leveled and stated that he sent the loan application in to the home office on November 29, 1949; and that the loan was rejected by the committee in the following language:

"Generally, we consider the entire proposition to be of a speculative type, and we cannot quite bring ourselves to invest the company's money in this venture. Also, we are not so pressed for good investments that we need take any loans on which there is the slightest semblance of reluctance to approve, and the general feeling of the committee is that we can well afford not to make this loan. The application is therefore declined."

This language indicates that the loan was not rejected because of the existence of the Cordoza trust deed but because

of the speculative type of the venture. Crawford was aware of the reasons for the rejection of the loan as shown by his letter to Bray dated December 9, 1949, in which he stated that the loan had been held up on the grounds that the organizational setup of the Hub Ranch prevented them from approving such a loan. It seems clear that Crawford's failure to secure the loan from the insurance company did not constitute a breach of the lease by the defendants and that the defendants were not liable for any damages which Crawford may have suffered by reason of his failure to obtain such a loan. Furthermore, the evidence indicates that Crawford had planted his crop prior to May 5, 1950; that it was then 2 or 3 inches out of the ground and that the well had been drilled and a pump installed.

Appellants contend that the damages awarded were excessive and totally unsupported by the evidence. Plaintiff claimed special damages in the sum of $49,360 and general damages in the sum of $250,000 and the sum of $134,640 was awarded by the jury. In reference to his claimed special damages plaintiff testified that he had records to show that he had spent the sum of $21,394.02 in his performance of the lease. However, the records were not produced in court. It was shown that total deposits and withdrawals in the bank accounts on which he drew during the time he was developing and occupying the leased premises amounted to $9,827.65. He claimed special damages in the sum of $25,000 for the loss of his barley crop on section 21. He bases this amount on the statement in the loan application filed by the Hub Ranch with the insurance company which contained a statement that Cordoza had produced 13,000 sacks of barley on the property and that it was sold for $70 per ton. However, the application does not show what sections were farmed or the conditions under which the crop was produced. Mr Cordoza was called as a witness and testified that he had raised a crop of barley on section 21 in 1953 but he did not testify as to the amount of grain produced as the trial court ruled out and excluded evidence of profits from future crops on the ground that it was too remote. Section 21 had not been farmed previous to the time Crawford commenced his operations. There was evidence in the record that the well on it would produce sufficient water to irrigate it if the land had been properly prepared; and that plaintiff was unable to irrigate more than a few acres. While plaintiff and DeLucas testified that the land would produce a minimum

of 1½ tons of barley to the acre, with a net profit to them of $27.50 per acre, the profits thus calculated would amount to only $17,600 a section.

Respondent argues that the lessees under the lease had a right to expect and anticipate the acquisition of several thousand acres of valuable land under the rental purchase provisions of the lease. In this connection there is no evidence that plaintiff was ·or would have been able to exercise the option to purchase and an award of damages on the assumption that the option would have been exercised cannot be sustained. (*Caspary* v. *Moore,* 21 Cal.App.2d 694, 699, 700 [70 P.2d 224].) Since the trial court excluded all evidence of profits and potential profits from crops to be raised on the leased property after the first year, there was no evidence upon which the jury could award damages therefor. It is our conclusion that a large part of the damages awarded by the jury was not supported by the evidence and was improperly awarded.

The respondent's principal contention herein is that the defendants caused his damage by failing to remove the Cordoza trust deed so that he could obtain a loan; that by reason thereof he was unable to irrigate his crops and they therefore failed. As heretofore pointed out the defendants insisted that paragraph 21 be inserted in the lease to provide for the payment of the indebtedness secured by the trust deed and reference to this indebtedness was made in the loan application to the insurance company. The evidence further shows that on May 5, 1950, Crawford had planted his crop, the grain was out of the ground 2 or 3 inches and he admitted that it was not then suffering from lack of water. He also admitted that a pump was to be installed as soon as he needed it and the fact that it was obtainable whenever he asked for it is shown by Norris' testimony. Between May 5 and May 12, 1950, Crawford attempted to irrigate the crop but found that he could not irrigate more than a few acres. There was testimony that the land was not properly prepared for such irrigation but that the well produced an adequate supply of water. The evidence herein is insufficient to show that plaintiff suffered damages proximately caused by a breach of the lease by the defendants. Furthermore, the damages awarded were excessive.

In view of what we have here said, it is not necessary to pass upon the other points raised by appellants.

The judgment is reversed and the order denying the motion

for judgment notwithstanding the verdict is reversed as to appellant Eva M. Halliburton, executrix of the estate of Clair Emory Halliburton, deceased.

Griffin, Acting P. J., concurred.

Barnard, P. J., being disqualified to participate, takes no part in this decision.

A petition for a rehearing was denied July 29, 1955, and respondent's petition for a hearing by the Supreme Court was denied September 1, 1955. Shenk, J., and Carter, J., were of the opinion that the petition should be granted.